**MICRO PACIFIC DEVELOPMENT INC., d/b/a Saipan Grand Hotel, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 98–1386.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 1999.

Decided June 18, 1999.

Joseph L. Manson, III argued the cause for the petitioner. Ronald B. Natalie and Douglas W. Hall were on brief.

David A. Seid, Attorney, National Labor Relations Board, argued the cause for the respondent. Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel at the time the brief was filed, and Peter Winkler, Attorney, National Labor Relations Board, were on brief. John D. Burgoyne, Acting Deputy Associate General Counsel, National Labor Relations Board, entered an appearance.

Before: SILBERMAN, HENDERSON and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Micro Pacific Development Company d/b/a Saipan Grand Hotel (Saipan) petitions the Court to set aside a final order of the National Labor Relations Board (NLRB or Board). Despite Saipan's assertion that four of its employees were supervisors engaged in pro-union, coercive electioneering, the Board concluded that the employees were not supervisors as defined in the National Labor Relations Act (NLRA or Act) § 2(11), 29 U.S.C. § 152(11). Saipan now attacks the Board's conclusion as unsupported by substantial evidence. In the alternative, Saipan argues that the results of the union election cannot stand because the Board erred in combining Saipan's resident and nonresi-

dent employees into a single bargaining unit. For the reasons set forth below, we grant Saipan's petition for review in part and grant the NLRB's cross-application for enforcement as to the remaining issues.

## I. Background

### A. The Representation Proceeding

■ Saipan is a beachfront resort hotel operating on the island of Saipan in the Commonwealth of the Northern Mariana Islands (CNMI).[1] On August 2, 1995 the Commonwealth Labor Federation and Hotel Employees and Restaurant Employees, Local 5, AFL–CIO (Union) filed a representation petition with the Board, seeking certification as the representative of Saipan's employees. The parties entered into an Election Agreement, stipulating that the Board had jurisdiction and that the appropriate bargaining unit consisted of all hotel employees.

After changing counsel, apparently due to original counsel's "inexperience[ ] in NLRA matters," Pet'r Br. at 3, Saipan sought to withdraw from the stipulated election agreement and requested a representation hearing. In its motion, it asserted *inter alia* that the Board lacked jurisdiction over its nonresident contract workers.[2] The NLRB's Regional Director (RD) denied Saipan's motion, finding that no changed circumstances justified withdrawal from the Election Agreement and that the Board had previously asserted jurisdiction over nonresidents working in the CNMI. *See Micro Pac. Dev., Inc.*, No. 37–RC–3720 (Sept. 20, 1995) (Order Den. Employer's Mot. to Withdraw From Stipulated Election Agreement & Req. for Representation Hr'g), Joint Appendix (JA) 17–21. Saipan sought Board review of the RD's decision.

On October 5, pursuant to the Election Agreement, the Board conducted a representation election among Saipan's employees. From a total of 84 eligible employees, 49 voted for unionization and 24 voted against. Three ballots were challenged, a number insufficient to affect the results.

Saipan subsequently filed four objections. The first three objections asserted that the Board lacked jurisdiction over nonresident workers and that, even if the Board had jurisdiction, nonresident workers were ineligible to vote in the election and could not be included in a bargaining unit with resident employees. In the fourth objection, Saipan claimed that supervisors engaged in coercive pro-union conduct requiring the election to be set aside.

On January 24, 1996 the Board denied Saipan's request to review the RD's denial of its motion to withdraw from the Election Agreement, holding that the jurisdictional issues were raised by Saipan in its election objections and that the denial of its request for review was without prejudice to the right to pursue its argument in the representation litigation. On February 22 the RD overruled Saipan's election objections. *See Micro Pac.*, No. 37–RC–3720 (Feb. 22, 1996) (Rep. on Objections), JA 45–51. After Saipan filed exceptions, the Board ordered a hearing before an administrative law judge (ALJ) on Saipan's allegations of supervisory pro-union conduct. Relying solely on the Election Agreement, the Board also adopted the RD's finding that the Board had jurisdiction over the nonresident employees. *See Micro Pac.*, No. 37–RC–3720 (June 24, 1996) (Decision & Order Directing Hr'g), JA 113–15.

On July 31, 1997 the ALJ overruled Saipan's objection alleging coercive conduct by supervisors. The ALJ found that Edwin Melon, Paquito Gonzales, Reynaldo

---

1. The Board's jurisdiction extends to labor cases arising in the CNMI. *See Micronesian Telecommunications Corp. v. NLRB,* 820 F.2d 1097, 1099–1101 (9th Cir.1987).

2. At the time approximately 70 per cent of the hotel's nonmanagement work force consisted of Filipino nonresidents who worked in the CNMI pursuant to one-year contracts.

Rojas and Sesinando Laderas were employees rather than supervisors and thus that their pro-union conduct was not objectionable. In the alternative, the ALJ found that Rojas's and Laderas's pro-union conduct was insufficient to materially affect the election results but that, if Melon and Gonzales were found by the Board to be supervisors, their conduct materially affected the election. *See Micro Pac.*, No. 37–RC–3720 (July 30, 1997) (ALJ's Decision), JA 116–46. The Board fully adopted the ALJ's findings and recommendation and certified the Union. Because the Board affirmed the ALJ's findings that the four individuals were employees, the Board found it "unnecessary to pass on the judge's alternative findings."[3] *Micro Pac.*, No. 37–RC–3720 at 2 n.2 (Mar. 26, 1998) (Decision & Certification of Representative), JA 195.

### B. The Unfair Labor Practice Proceeding

Following certification, Saipan refused to bargain or furnish requested information to the Union, whereupon the Union filed an unfair labor practice charge.[4] In its answer, Saipan admitted the allegations but challenged the validity of the certification. Thereafter, the General Counsel moved for summary judgment and the Board issued a show cause notice.

On August 19, 1998 the Board granted the General Counsel's motion for summary judgment. In its Decision and Order, the Board found that "[a]ll representation issues raised by [Saipan] were or could have

been litigated in the prior representation proceeding," and that Saipan did not offer to adduce "any newly discovered and previously unavailable evidence, nor [did] it allege any special circumstances" that would require the Board to modify its decision in the representation proceeding. *Micro Pac. Dev., Inc.*, 326 N.L.R.B. No. 20 at 1 (Aug. 19, 1998). Accordingly, the Board concluded that Saipan's refusal to bargain and to furnish requested information violated the NLRA. The Board required Saipan to cease its unfair labor practices, post a remedial notice, bargain with the Union upon request and supply the requested information. *See id.* at 2. Saipan then petitioned this Court to review the Board's decision and the NLRB cross-applied for enforcement of its order.

## II. DISCUSSION

Pursuant to section 10 (e) and (f) of the NLRA, 29 U.S.C. § 160(e), (f), we will reverse the Board if, "upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *International Union of Electronic, Elec., Salaried. Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C.Cir.1994) (quotations omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v.*

---

3. Although the Board did not reach the issue, the ALJ found that Melon and Gonzales had engaged in pro-union behavior which "reasonably tended to coerce employees in the exercise of their Section 7 rights." JA 144–45. Between them, Melon and Gonzales supervised 20 employees, enough to change the outcome of the election. Indeed, Melon alone supervised enough employees (14) to change the result. The NLRB decided the supervisory status issue without reaching the coercion issue. *See* JA 195 n.2.

4. The General Counsel issued a complaint, alleging that Saipan's refusal to bargain and

supply information violated NLRA § 8(a)(1), (5), 29 U.S.C. § 158(a)(1), (5). Section 8(a)(1) and (5) of the NLRA respectively make it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of title 29]" and "to refuse to bargain collectively with the representative of his employees." 29 U.S.C. § 158(a)(1), (5). Section 7, in turn, grants employees, *inter alia* "the right to self-organization" and "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157.

*NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."). Moreover, the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, ——, 118 S.Ct. 818, 829, 139 L.Ed.2d 797 (1998).[5]

### A. Supervisors

■ Section 2(3) of the NLRA excludes from the term "employee" "any individual employed as a supervisor." 29 U.S.C. § 152(3). Section 2(11) defines "supervisor" as follows:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if

in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The first portion of section 2(11) is stated disjunctively—the possession of any of the enumerated powers is sufficient to establish supervisory status. Section 2(11)'s conjunctive language, however, mandates that the exercise of any of the powers "must require independent judgment, . . . and cannot be merely routine, clerical, perfunctory, or sporadic." *Desert Hosp.,* 91 F.3d at 193. In short, to be considered a supervisor, one must exercise only *one* of the enumerated supervisory functions, using independent judgment in doing so.

■ In its main attack on the ALJ's and the Board's findings, Saipan asserts that Edwin Melon should have been considered a statutory supervisor. Melon was one of three "housekeeping supervisors" reporting directly to Atsushi Suzuki, the Assistant Front Manager in charge of Saipan's housekeeping department. According to the ALJ's finding, Melon was the only employee with that title from at least 1993 until six months before the election.[6] Even though the ALJ found that Melon possessed several supervisory indicia[7] and

---

**5.** Saipan urges us to abandon our traditional deference standard and instead engage in a more probing review of the Board's supervisory status determinations, pointing to other circuits which have taken this approach. *See, e.g., Beverly Enters. v. NLRB,* 148 F.3d 1042, 1045 (8th Cir.1998); *NLRB v. Meenan Oil Co.,* 139 F.3d 311, 321 (2d Cir.1998); *NLRB v. St. Mary's Home, Inc.,* 690 F.2d 1062, 1067 (4th Cir.1982). We give the Board's supervisory findings their traditional "special weight." *Desert Hosp. v. NLRB,* 91 F.3d 187, 193 (D.C.Cir.1996).

**6.** After two other employees were promoted to supervisor, Melon acted as a supervisor three days per week while the other two each acted as supervisor two days per week. There was never more than one housekeeping supervisor on duty during the day, except during brief training periods. Melon was the highest paid nonmanagerial housekeeping employee and was identified by the maids as

their primary supervisor before the election. Most of the housekeeping staff worked from 9:00 a.m. to 5:00 p.m., with one maid scheduled from noon to 8:00 p.m. and another scheduled from 5:00 p.m. to 1:00 a.m. High occupancy periods were dealt with by: (1) overtime; (2) calling in maids who were not scheduled to work; (3) adding "bonus" rooms—additional rooms for which the maid received no compensation other than tips—to a maid's schedule; or (4) scheduling maids for "back-to-back" room preparation, which required them to return to the hotel in the early morning hours to prepare vacated rooms. The maids viewed "back-to-back" assignments as valuable because they were paid double time with a two-hour minimum.

**7.** Melon assigned housekeepers, directed their work, disciplined them and recommended whether their contracts should be renewed. *See* JA 125–28.

exercised this authority "in the interest" of Saipan, *see NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 578, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994) ("[A]cts within the scope of employment or on the authorized business of the employer are 'in the interest of the employer.' "), he nevertheless concluded that Melon was not a section 2(11) supervisor because he failed to meet the "independent judgment" test of section 2(11). JA 130–31. The Board adopted the ALJ's findings, concluding that there was "no evidence that Melon's duties required the exercise of independent judgment or that Melon effectively recommended changes in the employees' terms and conditions of employment." JA 195 n.2. For the following reasons, we reject the Board's conclusion that Melon did not exercise independent judgment as unsupported by substantial evidence.

The Board's conclusion that Melon exercised no independent judgment but rather performed duties that were "routine for the most part and decidedly clerical for the remainder" contradicts the ALJ's factual findings, which manifest that Melon had substantial autonomy in dealing with the housekeeping staff regarding scheduling, assignment and discipline. JA 130. As to assignments and scheduling, the record established that Melon dealt with these issues often "without regular or concerned oversight by Suzuki or another assistant manager." JA 127; *see Eskaton Sunrise Community*, 279 N.L.R.B. 68, 75 (1986) (employee who assigned housekeeping duties, checked employees' work, obtained replacements for sick employees and performed written evaluations held to be supervisor); *Mr. Steak, Inc.*, 267 N.L.R.B. 553, 555 n. 3 (1983) (scheduling employee working hours confers supervisory status).

As the ALJ noted, "[T]he more typical handling [of overtime] was for Melon to recognize [a] need, [and] merely inform Suzuki as to what he would do." JA 128 (when the late shift maid did not report, "the problem devolved to Melon for solution," and he was "both initiator of the overtime inquiry, and also did so by one-on-one conversations rather than throwing the opportunity open to shift members as a whole"). "[M]anagers [also] did not participate in the decision" as to who received back-to-back assignments. *Id.*[8] Moreover, because of the "focused, sudden needs" associated with occupancy surges, Melon was often required to draw on "his awareness from experience and observation about whether the composite capabilities of scheduled housekeepers on a given day was sufficient to complete all readying work throughout the hotel's guest rooms." JA 127, 128; *see Glenmark*, 147 F.3d at 343 ("[T]he decisions of whether to call in additional staff and whether to reorganize the schedule to accommodate ... emergencies require the exercise of independent judgment."). Thus, rather than being "practically automatic", JA 130, "guest room preparation was greatly affected by surges of people [which], in turn, created an array of special procedures" and required Melon to make independent determinations in scheduling and assigning the employees, JA 123; JA 860–61 (if Melon did not deem maid's reasons for switching days "important" enough, he did not permit switch even though another maid agreed); *id.* 714 (Melon assigned bonus rooms without management oversight or complaint); *id.* 127 (when need arose to have rooms "quick cleaned," Melon's assignment process was not "given regular

8. In its brief, the Board even admits that Melon exercised independent judgment. According to the Board,

At the start of each day, Manager Suzuki notified Melon if he needed to distribute "bonus rooms" because of a housekeeper's absence. Melon distributed the absent housekeeper's preassigned rooms by taking into account workload—that is, trying to give extra rooms to the housekeepers whose preassigned block of rooms contained few checkouts—and capability.

Resp't Br. at 17; *see NLRB v. McCullough Envtl. Servs.*, 5 F.3d 923, 941 (5th Cir.1993) ("the authority to assign operators to specific tasks, based in part on their assessment of the employees' ability and the expertise required" indicates supervisory status).

or concerned oversight by Suzuki or another assistant manager").

Moreover, it appears that Melon exercised independent judgment in rewarding employees. For instance, the ALJ found that the "potential of rewarding housekeeping employees was constantly present" and mentioned the distribution of back-to-back room assignments, with their "prized overtime guarantees," as the "most striking instance" of Melon's ability to reward. JA 127. Although the selection process is unclear, "managers did not participate in the decision." JA 127. We also note that Melon's usual practice of coupling a back-to-back assignment with days off "was not always carried through that mechanically." JA 127–28. The ALJ, however, suggested that, in making the prized assignments, Melon was not rewarding employees "within the meaning of the Act" since "the employees *earned* their extra pay either by extending their shift or by appearing for odd late night times when back to back was performed." JA 131 (emphasis original). But we disagree with the ALJ's underlying inference that a reward must be wholly gratuitous—Melon used independent judgment in determining who received the choice assignments notwithstanding the fact he did not control their compensation.[9]

Furthermore, the Board counsel's endorsement of the Board's conclusion is based on insufficient evidence arbitrarily culled from the record. *See Universal Camera,* 340 U.S. at 488, 71 S.Ct. 456 ("[A] reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."). For example, the Board counsel relied on eleven portions of transcript to support his conclusion that "Suzuki [rather than Mel-

on] preassigned the housekeepers to specific sections, rotating their assignments periodically." Resp't Br. at 15. Eight of the citations, however, involve witnesses whom the ALJ disbelieved, two provide only weak support and the last contradicts the Board's conclusion, *see* JA 864–65 (testimony of Darlin Rebusquillo, noting that Melon assigned all bonus rooms on days he acted as supervisor). Since the counsel relied on evidence the ALJ deemed unreliable or untrustworthy while at the same time accepting the ALJ's credibility findings, we reject his assertion that Melon's supervisory status is based on substantial evidence from the record as a whole. *See Air Canada v. DOT,* 148 F.3d 1142, 1151 n. 15 (D.C.Cir.1998) ("[W]here credibility of witnesses is at stake, an [ALJ's] evaluation of the witness' testimony can be an indicator of the substantiality of the evidence.") (citations omitted); *Capital Cleaning Contractors v. NLRB,* 147 F.3d 999, 1004 (D.C.Cir.1998) ("[A] court must uphold Board-approved credibility determinations of an ALJ unless they are hopelessly incredible or self-contradictory or patently insupportable.") (quotations omitted).

Finally, we disagree with the Board's treatment of *Perry d/b/a Holiday Inn–Glendale,* 277 N.L.R.B. 1254 (1985), which Saipan relied on for the proposition that deciding whether an employee should be asked to work overtime requires the exercise of independent judgment. The ALJ initially refused to use the decision "for any comparative purposes" because (1) the individual held to be a supervisor in *Holiday Inn–Glendale* held the position temporarily and could only authorize 10 to 20 minutes of overtime and (2) if he had been found not to be a supervisor, there would have been 70 unsupervised employees in the department. JA 132. Melon exercised much more independent judgment than the temporary supervisor with limited overtime authority in *Holiday Inn–Glen-*

---

9. Melon also exercised independent judgment by withholding assignments from those who

alienated him. *See* JA 1021.

*dale.* Not surprisingly, the Board also attempts to distinguish *Holiday Inn–Glendale* in its brief by pointing to several facts which it claims are not present here. *See* Resp't Br. at 29 n.13. At least one fact in common with *Holiday Inn–Glendale* was present here: the housekeeping employees believed that Melon was in charge of them. He was identified by the maids as their primary supervisor in the months immediately before the election, and in December 1993, a number of housekeepers petitioned Saipan to replace him because of supervisory shortcomings. This situation and Saipan's response to it—which was to counsel Melon on improved supervisory techniques—would not have occurred unless Melon was both treated as a supervisor by Saipan and, more importantly, viewed as such by the other employees.

■ Saipan also argues that the Board erred by not finding Waiter Supervisor Paquito Gonzales, Waiter Supervisor Reynaldo Rojas and Bartender Supervisor Sesinando Laderas to be statutory supervisors.[10] As it does with regard to Melon, Saipan contends that Gonzales, Rojas and Laderas exhibited independent judgment by assigning, evaluating and disciplining other employees. But several factors distinguish Gonzales, Rojas and Laderas from Melon. Accordingly, we affirm the Board's decision not to classify Gonzales, Rojas and Laderas as section 2(11) super-

visors. *See International Union,* 41 F.3d at 1536.

Although Gonzales, Rojas and Laderas had some authority to make assignments within shifts and to assign occasional overtime, their decisions were reviewed by management and, in the case of Laderas, often overruled. We agree with the ALJ that the hotel's "rigidly structured management team for food and beverage operations ... was a dominating feature of the various restaurant and food serving operations." JA 138, 140. We find this finding significant because the managers' overlapping six-day work weeks and their continuous, on-site oversight of operations leaves no doubt that they, rather than the waiter and bartender supervisors, were in charge. Thus, the Board reasonably concluded that Gonzales, Rojas and Laderas acted only as "leadmen" regarding assignments and scheduling with limited authority to assist in operations but with no true decision making power. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 280–81, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (Congress sought to distinguish between supervisory personnel, vested with "genuine management prerogatives," and employees—such as "straw bosses, leadmen, and set-up men, and other minor supervisory employees"—who enjoy NLRA's protections even though they perform "minor supervisory duties." (quotation omitted)); *see* JA 138–43 ("all true judgmental factors

10. The hotel has several restaurants and two bars. Yoshitaka Mitsuda, the restaurant manager, oversaw restaurant operations. He worked 6 days per week, generally from 9:00 a.m. to 11:00 p.m. · Mitsuda spent approximately 2 to 3 hours per day observing employees and also approved all vacation and sick leave. Five assistant restaurant managers (ARM) assisted Mitsuda in supervising restaurant operations. The ARMs worked six days per week from mid-morning to approximately 11:00 p.m. The ARMs scheduled employees for shifts and decided whether to replace sick employees. In addition to providing general oversight throughout all of the restaurants, the ARMs also assisted in serving customers when the restaurants were busy. Also, Adelaida Ventura and Melinda

Javier served as "head supervisors" in the hotel's food services operation although they usually spent up to 90 per cent of their time performing regular waitress duties.

Gonzales and Rojas began working for Saipan in 1991. In 1994 Gonzales became a "waiter supervisor" in which capacity he served until the spring of 1996, when his contract was not renewed. Rojas also became a "waiter supervisor" in 1994. Gonzales and Rojas reported to head supervisors Ventura and Javier. Laderas began working at the hotel in 1991. In 1993 he was appointed "bartender supervisor," a position he held until his contract was not renewed in December 1995. Laderas reported to ARM Takeo Yamashiro, who managed the Southern Cross bar and Coral restaurant.

were absorbed into the layered array of manage[rs] above").

In addition, Gonzales and Rojas occasionally informed management about the performance of other employees but the Board reasonably found no evidence that Saipan made any decision to adjust the wages of any employee based upon their opinions. *See Beverly–Enters.–Pa., Inc. v. NLRB,* 129 F.3d 1269, 1270 (D.C.Cir.1997); *see also NLRB v. Adco Elec., Inc.,* 6 F.3d 1110, 1117 (5th Cir.1993) (reporting problems "is nothing more than … any … employer would expect of experienced employees"). Although a manager suggested that Rojas effectively evaluated other employees, the ALJ discredited his testimony with Rojas's own statement. *See* JA 140–41. Nor does Saipan advance its case by showing that Laderas completed written evaluations of other employees. The evaluations contained no recommendation and failed to affect any employee's terms and conditions of employment. Laderas received no instructions about the evaluations and never spoke to employees about them. Instead, Laderas believed that Saipan used the evaluation to choose the employee of the year.

Similarly, we find no evidence that Gonzales, Rojas and Laderas ever effectively disciplined other employees. Although Saipan relied on (to support their disciplinary authority) a document that they were asked to draft, the document speaks of voluntary compliance and the ALJ reasonably discredited evidence suggesting that Gonzales had in fact exerted his disciplinary authority. *See Capital Cleaning Contractors,* 147 F.3d at 1004; JA 137, 982–87 (policy statement). Thus, the Board reasonably refused to classify Gonzales, Rojas and Laderas as section 2(11) supervisors because their exercise of supervisory au-

thority was at best "perfunctory" and "sporadic." *Desert Hosp.,* 91 F.3d at 193.

### B. Bargaining Unit

■ Saipan also argues that the Board's decision to include its resident and nonresident employees in the same bargaining unit was not supported by substantial evidence. According to Saipan, its resident and nonresident employees do not share a sufficient "community of interest" to permit their combination into one bargaining unit because of the control over the terms and conditions of nonresident employment imposed by CNMI immigration law. Pursuant to the CNMI's Non-resident Workers' Act (NWA) and the regulations promulgated thereunder,[11] Saipan must follow specific procedures in hiring, employing, retaining and terminating nonresident workers and must adopt wages, benefits and other terms and conditions of employment applicable only to nonresident employees. Besides creating differences in the wages and benefits of nonresidents and residents, the provisions mandate a minimum number of hours per week that nonresidents must work and effectively prohibit nonresidents—but not residents—from transferring to other positions. *See* NWA, 3 N. Mar. I. Code Ch. 4 (1983); Alien Labor Rules & Regulations (ALRR), 10 N. Mar. I. Reg. 4 §§ II, III (1988). Because of these differences, Saipan contends that a unit consisting of residents and nonresidents is inappropriate because their conflicting interests make it impossible for a union to carry out its duty to fairly represent both groups. As a result, Saipan concludes that nonresident and resident workers do not share a community of interest and requests a Board hearing on the issue.

Were Saipan writing on a clean slate, it could argue that the Board erred by com-

---

11. The CNMI retains "local control over immigration," H. R. Rep. No. 94–364, at 9 (1975), because the covenant that delineates the political relationship between the United States and the CNMI and enumerates which federal laws apply expressly excludes the

"immigration and naturalization laws of the United States." Covenant to Establish a Commonwealth of the N. Mariana Islands in Political Union With the United States, § 503(a), *reprinted at* 48 U.S.C.A. § 1681.

bining its resident and nonresident employees into a single bargaining unit. *See, e.g., Lycee Francais de New York,* 273 N.L.R.B. 1538 (1985) (finding no community of interest between resident and nonresident employees at private school); *but see Saipan Hotel Corp., d/b/a Hafadai Beach Hotel,* 320 N.L.R.B. 192 (1995); *see also Thomas–Davis Med. Ctrs., P.C. v. NLRB,* 157 F.3d 909, 914 (D.C.Cir.1998) (Board must provide "reasoned explanation, either consistent with precedent or explaining its departure therefrom" in interpreting its rules). But Saipan is not writing on a clean slate because in the Election Agreement, it stipulated that a unit containing all of its employees constituted an appropriate bargaining unit.[12] *See* JA 3. Aside from asserting that it changed its original counsel who was apparently inexperienced in labor matters, Saipan offers no changed or unusual circumstances entitling it to withdraw its stipulation. *See NLRB v. Unifemme, Inc.,* 570 F.2d 230 (8th Cir. 1978) (requiring changed or unusual circumstance to withdraw stipulation); *Sunnyvale Med. Clinic,* 241 N.L.R.B. 1156 (1979) (similar); *cf. NLRB v. Local Union No. 74, International Ass'n of Marble, Slate & Stone Polishers, Rubbers & Sawyers, Tile & Marble Setters' Helpers, & Marble Mosaic & Terrazzo Workers' Helpers of U.S. & Canada,* 471 F.2d 43, 45–46 (7th Cir.1973) (alleged inexperience and lack of knowledge of NLRB procedures of union's first counsel did not constitute "extraordinary circumstances" under NLRA § 10(e)). In its motion to withdraw, *see* JA 10, Saipan argued that "unusual" circumstances existed because the stipulated unit contained "nonresident employees who are outside the Board's jurisdiction." The RD, however, found that Saipan failed

to present evidence of unusual or changed circumstances. The RD further noted that the Board previously asserted its jurisdiction over both resident and nonresident workers in the CNMI, *see Saipan Hotel Corp., d/b/a Hafadai Beach Hotel,* 320 N.L.R.B. 192 (1995) (*Hafadai*), and the Ninth Circuit enforced the Board's decision, *see* 114 F.3d 994 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1034, 140 L.Ed.2d 101 (1998). Thus, the RD, and ultimately the Board, rejected Saipan's arguments.

Saipan now claims that the RD and the Board abdicated their responsibilities under the Act by relying on *Hafadai* and by not making an independent determination about the appropriateness of the bargaining unit in this case.[13] Saipan, however, ignores our precedent in asserting that the Board must determine the appropriateness of the bargaining unit notwithstanding its stipulation.

> When it sets out *de novo* to define a bargaining unit, the NLRB determines which employees share common interests.... This is a matter for the Board's expertise, and we will rarely disturb its conclusion. When the parties stipulate the bargaining unit, however, the Board has a more limited role. First it must ensure that the stipulated terms do not conflict with fundamental labor principles. Having done so, its task is simply to enforce the agreement. If the terms of the stipulation are unambiguous, the Board must hold the parties to its text.

*Avecor, Inc. v. NLRB,* 931 F.2d 924, 932 (D.C.Cir.1991), *cert. denied sub nom. Oil, Chem. & Atomic Workers Intern. Union v. Avecor, Inc.,* 502 U.S. 1048, 112 S.Ct. 912,

---

**12.** Saipan also admitted in its pleadings that the bargaining unit is appropriate. *See* JA 215, 224, 228.

**13.** Saipan relies primarily on *NLRB v. Indianapolis Mack Sales & Serv., Inc.,* 802 F.2d 280, 284 (7th Cir.1986) ("Section 9(b) imposes a nondelegable duty on the Board to determine appropriateness" of bargaining unit), to

support its argument. But *Mack Sales* is inapposite because there the employer refused to stipulate to the bargaining unit and the ALJ then declined to receive evidence on the issue. *See* 802 F.2d at 284 ("NLRB cannot discharge [its] obligation *by simply finding that the parties did not vigorously pursue the issue*" (emphasis added)).

116 L.Ed.2d 812 (1992); *accord NLRB v. Southern Indiana Gas & Elec. Co.,* 853 F.2d 580, 582 (7th Cir.1988), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 973 (1989) ("Once parties enter into a stipulation ... the parties are bound by their agreement unless it violates the Act or Board policy.").

 Saipan nevertheless asserts that its stipulation placing residents and nonresidents in the same bargaining unit was improper because both the NWA and the ALRR set forth requirements that do not apply to resident employees. *See* Pet'r Br. at 35–43. Yet in *Hafadai,* the Board held, with Ninth Circuit approval, that the CNMI labor and immigration laws and regulations do not preclude residents and nonresidents from comprising a single bargaining unit. *See* 320 N.L.R.B. 192 (1995), *enforced,* 114 F.3d 994, 997–99 (9th Cir. 1997). Although Saipan argues that the Board improperly relied on this authority, the Board cannot ignore its precedent without a "reasoned explanation." *Thomas-Davis Med. Ctrs.,* 157 F.3d at 914.[14]

Accordingly, we grant the petition for review in part and remand to the Board to determine whether Melon's conduct violated the NLRA. In all other respects, we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*

---

14. We also find no merit in Saipan's request for a hearing to determine whether the stipulated bargaining unit was appropriate. Pursuant to 29 C.F.R. § 102.69(d), the Board conducts a hearing if the objecting party has raised substantial and material factual issues. *See Amalgamated Clothing Workers v. NLRB,* 424 F.2d 818, 828 (D.C.Cir.1970). Where, as here, the RD assumed the facts alleged in the objections to be true but found, as a matter of law, that those facts did not justify setting aside the election, no hearing is required. *See NLRB v. Air Control Prods.,* 335 F.2d 245, 249 (5th Cir.1964). Because Saipan offered no evidence in support of its objection except the CNMI regulations, there were no material facts at issue and the RD (and later the Board) could rely on *Hafadai* to answer the purely legal question whether the CNMI regulations prevent resident and nonresident employees from inclusion in a single bargaining unit.