# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 14, 2022          Decided March 3, 2023

No. 21-1249

INTERNATIONAL ORGANIZATION OF MASTERS, MATES &
PILOTS, ILA, AFL-CIO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SUNRISE OPERATIONS, LLC,
INTERVENOR

———

On Petition for Review of an Order
of the National Labor Relations Board

———

*Lisa C. Demidovich* argued the cause for petitioner. With her on the briefs were *Jason Wojciechowski* and *Luke Taylor*.

*Catherine L. Fisk* was on the brief for *amici curiae* Labor Law Professors in support of petitioner.

*Kellie Isbell*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David Habenstreit*,

Assistant General Counsel, and *Elizabeth Heaney*, Supervisory Attorney.

*Kara E. Cooper* argued the cause for intervenor Sunrise Operations, LLC in support of respondent. With her on the brief was *William G. Miossi*.

Before: HENDERSON and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Since 1981, the International Organization of Masters, Mates & Pilots, ILA, AFL-CIO ("the Union" or "IOM"), has been the lawful bargaining agent for the Licensed Deck Officers ("LDOs") on four container ships that carry goods between ports in California and Hawaii. The LDOs are licensed by the Coast Guard and they include a master, first (or "chief"), second, and third officers (also called "mates") on each of the four ships. For four decades, the Union has negotiated with a series of successor companies that have owned the vessels to reach collective bargaining agreements covering the LDOs. In 2015, The Pasha Group purchased the ships, and its wholly owned subsidiary, Sunrise Operations, LLC ("Sunrise"), now operates the vessels and is the most recent successor employer of the LDOs.

In 2017 and 2018, the Union sought information from Sunrise regarding the LDOs on the four vessels. Sunrise refused to provide the information sought by the Union and then refused to participate in arbitration at the Union's headquarters in Maryland, as required by the parties' collective bargaining agreement. The Union filed unfair labor practice

("ulp") charges with the National Labor Relations Board ("Board" or "NLRB"). The Board's General Counsel then filed a complaint alleging that Sunrise had violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1), (5), when it failed to provide information to the Union and declined to participate in arbitration proceedings in Maryland.

A hearing on the ulp charges was held before an Administrative Law Judge ("ALJ"). The judge found, *inter alia*, that the Union was the LDOs' exclusive bargaining representative; that Sunrise had admitted that it recognized the Union as such, as had three predecessor employers who owned the vessels before Pasha and Sunshine; and that because the LDOs who were second and third mates were employees, not supervisors under Section 2(11) of the NLRA, 29 U.S.C. § 152(11), the LDOs' bargaining unit was an appropriate "mixed" unit of statutory employees and supervisors. The ALJ thus rejected Sunrise's claim that it had no duty to bargain with the Union under Section 8(a)(5) of the NLRA because the LDO unit consisted entirely of supervisors. Given that Sunrise and its predecessors had recognized and bargained with the Union on behalf of the LDOs, and that the Union retained majority support among the bargaining unit employees, the ALJ concluded that Sunrise had violated the NLRA by refusing to provide the Union with the information that it had sought and by failing to abide by an agreement requiring the parties to meet for arbitration proceedings in Maryland.

Sunrise filed exceptions with the NLRB to contest the ALJ's decision. The employer's principal argument before the ALJ was that all of the LDOs were in fact supervisors and, therefore, the LDOs did not constitute an appropriate bargaining unit under the Act. Sunrise pressed this same argument in its exceptions to the Board. A 2-1 majority of the

Board ruled against the Union, but it never addressed the issue raised by Sunrise, *i.e.,* whether the Board lacked jurisdiction because all of the LDOs were *in fact* supervisors. Instead, the Board majority held that it had no jurisdiction to hear the case because, as the Board saw it, Sunrise *believed* that all of the LDOs were supervisors. In the majority's view, it did not matter whether, as the ALJ found, the second and third mates were not supervisors. According to the majority, what mattered was that when Sunrise and its predecessors voluntarily recognized the Union as the unit's bargaining representative, they did not *believe* that the LDO unit was a "mixed" unit.

It is clear that the majority opinion for the Board purports to decide this case without regard to the parties' principal claims presented to the ALJ, and it rests on a position that was never advanced by Sunrise either before the ALJ or in its exceptions to the Board. Sunrise never argued that the disposition of this case should turn on the employer's *subjective beliefs* about whether the LDOs were supervisors. And we can find no case in which the Board or a reviewing court has held that an employer's *unannounced beliefs* about workers' supervisory status determines whether the Board has jurisdiction to enforce the NLRA.

For the reasons explained below, we find that the Board's holding in this case lacks support in the record, defies established law, and creates a new rule without reasoned justification. It thus fails substantial evidence review and is arbitrary and capricious for want of reasoned decision making. We therefore grant the petition for review, vacate the Board's decision, and remand the case for reconsideration consistent with this opinion.

## I.  BACKGROUND

### A.  Statutory and Regulatory Background

Under the NLRA, labor organizations like IOM "can achieve the status of a majority collective bargaining representative through either Board certification or voluntary recognition by the employer[.]" *Raymond F. Kravis Ctr. for Performing Arts, Inc. v. NLRB*, 550 F.3d 1183, 1188 (D.C. Cir. 2008). Section 8(d) of the Act requires an employer and a recognized union representative "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party." 29 U.S.C. § 158(d). This means that the employer and the union bargaining agent have a mutual obligation to "confer in good faith with respect to any question arising under [the parties' collective bargaining agreement]." *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 436-37 (1967) (cleaned up). The duty to bargain also requires an employer to provide information that is needed by a recognized union for the proper performance of its duties as the employees' bargaining agent. *Id.* at 435-36.

A "supervisor" is not an "employee" entitled to protection under the NLRA. 29 U.S.C. § 152(3) (excluding "supervisor[s]" from definition of employee). Statutory supervisors are those with authority to act "in the interest of the employer" to carry out or "effectively to recommend" at least one of twelve enumerated activities, provided that the exercise of that authority requires "the use of independent judgment." 29 U.S.C. § 152(11); *see NLRB v. Health Care & Ret. Corp.*, 511 U.S. 571, 573-74 (1994). The twelve activities are: "to hire, transfer, suspend, lay off, recall, promote,

discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action." 29 U.S.C. § 152(11).

The Board looks beyond mere labels or job descriptions to determine supervisory status. *See, e.g.*, *G4S Regulated Sec. Sols*, 362 NLRB 1072, 1073, 1074 n.9 (2015); *Dole Fresh Vegetables, Inc.*, 339 NLRB 785, 785 (2003). And the party asserting supervisory status bears the burden of proof on the point. *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 710-12 (2001).

## B. The Parties' Dispute

In 1981, the Union on behalf of the LDOs who were working aboard the four container ships signed a collective bargaining agreement ("CBA") with one of the companies that was a predecessor to Sunrise. The CBA describes LDOs as follows:

> The Master is the [LDO] in command of the vessel at all times, subject to the lawful directives of the Company.

> The Chief Officer is the Head of the Deck Department and as such, performs supervisory duties outlined in this agreement. In addition, he performs the duties of the Master as necessary in the Master's absence.

> The Second Officer is the Navigating Officer and, subject to the direction of the Master, is in charge of all navigational equipment, and is responsible for maintaining charts, publications, and navigational equipment, in accordance with all pertinent navigation regulations and statutes . . . .

The Third Officers stand a regular navigation watch at sea and assist in the normal operation of the vessel as directed by the Department Head.

Joint Appendix ("J.A.") 369. The CBA explains, *inter alia*, that "[t]he Parties agree that the duties of the [LDOs] . . . shall be maintained as supervisory and professional" and notes that LDOs are tasked with "the shipboard supervision" of certain maintenance and cargo activity. J.A. 369, 370.

The Pasha Group purchased the four ships in 2015, retaining a majority of the Union-represented LDOs who were employed aboard the ships. The Pasha Group assured the Union that it would assume and abide by the 1981 CBA and recognize the Union as the LDOs' exclusive bargaining representative. It agreed that it would "not engage in activities . . . calculated to undermine" the Union's status. J.A. 362. Although the employer has been variously described as The Pasha Group, Pasha Hawaii, SR Holdings, and Sunrise, the Union has routinely interacted with Sunrise. The ulp complaint in this case asserts that Sunrise violated the NLRA by failing or refusing to provide information to the Union, by delaying the provision of such information, and by repudiating a CBA provision that required arbitration to occur in Maryland. Petitioner's Br. 1-2, 9. And Sunrise has entered an appearance as Intervenor before this court (as the employer of the LDOs).

### C. Proceedings Before the ALJ

In response to the complaint filed by the Board's General Counsel, Sunrise raised several affirmative defenses. None of the defenses rested on a claim that Sunrise or its predecessors always *believed* that the LDOs in the bargaining unit included only supervisors. Rather, Sunrise's principal claim was that the

Board lacked jurisdiction over this case because all of the LDOs in the bargaining unit are *in fact* supervisors. The NLRB General Counsel and the Union countered that "the second and third mate officers are *employees*, not supervisors under Section 2(11)." J.A. 41 (emphasis added). A second and third mate testified that they did not perform any NLRA Section 2(11) supervisory functions for Sunrise. J.A. 202-11, 227-32. And Counsel for the Union testified that the Union had never stipulated to the supervisory status of all LDOs in any of the approximately 50 ulp charges it had filed in the last two decades. J.A. 95-96.

The ALJ conducted a fact-intensive inquiry – including an assessment of disciplinary records, on-board technological advancements that had routinized the roles of second and third mates, and other evidence – and found that the LDOs comprise a mixed unit of statutory employees and supervisors. Sunrise had not been compelled by law to recognize the mixed unit, but the ALJ found that it was clear from the record that Sunrise opted to do so. Accordingly, the ALJ concluded that the NLRB had jurisdiction over the case. The ALJ additionally held that Sunrise violated the NLRA by refusing to timely provide relevant information to the Union, and by refusing to meet in Maryland for arbitration proceedings as required by the parties' CBA.

The ALJ also offered detailed responses to each of Sunrise's allegations regarding the supervisory status of second and third mates. *First, the ALJ rejected Sunrise's claims that certain LDO responsibilities transform all LDOs into supervisors.* Sunrise had argued that second and third mates are supervisors "by law" when they serve as Officers of the Watch, referring to a role outlined by the International Safety Management Code. The ALJ disagreed, finding that in this role, second and third mates' "use of independent judgment and

discretion is circumscribed by the master's standing orders, and the Operating Regulations[.]'" J.A. 41 (quoting *Chevron Shipping Co.*, 317 NLRB 379, 381 (1995)). More broadly, the ALJ found that in carrying out each of their responsibilities, second and third mates must: "(1) follow the Master's established orders or seek clarification from the superior on duty on handling any particular situation, or (2) adhere to the established protocols found in [Sunrise's] Safety Management Administration policies." J.A. 41. In no role did the second and third mates perform "any supervisory functions as set forth in Section 2(11) of the [NLRA]" over other employees. J.A. 42.

*Second*, *the ALJ rejected Sunrise's claim that all LDOs evaluate unlicensed crew.* The ALJ found that Sunrise failed to proffer a single example of second and third mates asserting disciplinary responsibilities over unlicensed crew. For instance, the ALJ found no proof in the record that second and third mates ever issued disciplinary letters to other employees. The ALJ concluded that none of the responsibilities of second and third mates in their relationships with unlicensed crew required independent judgment or satisfied other indicia of supervisory status.

*Third*, *the ALJ rejected the testimony of a Sunrise Officer as to his knowledge regarding whether Sunrise's LDOs were supervisors.* The ALJ tellingly said: "I accord [the officer's] testimony very little weight since it constitutes mainly opinion evidence. In fact, [he] has no independent or expert knowledge regarding the supervisory status of [Sunrise's] LDOs much less Section 2(11)'s standards for evaluating one's supervisory status. Simply put, [Sunrise] has failed to show that its LDOs are supervisors under the Act." J.A. 42.

In sum, the ALJ concluded that Sunrise failed to meet its "burden of proving [all LDOs'] supervisory status," J.A. 41.

Instead, the ALJ found that "the evidence clearly shows that [Sunrise]'s second and third mate officers perform duties that are routine in nature and do not perform any supervisory functions as set forth in Section 2(11) of the Act." J.A. 42. As explained below, the Board did not dispute any of the ALJ's findings.

Finally, the ALJ rejected Sunrise's argument that the Board lacked jurisdiction over this case because the Union was never certified by the NLRB as the exclusive bargaining representative of the LDOs. The ALJ properly noted that certification is not the only way to prove majority-support status. J.A. 42 (citing *Barrington Plaza & Tragniew, Inc*., 185 NLRB 962, 963 (1970), *enforced in part,* 470 F.2d 669 (9th Cir. 1972). The ALJ explained that:

> The issue . . . is not whether the unit is appropriate or whether the Board could have initially certified the unit under the Act. . . . Rather, it is whether the employer voluntarily agreed to recognize . . . a "mixed" unit. . . . [W]here an employer has consented to a bargaining unit that includes supervisors, the [Board] properly may find the employer guilty of an unfair labor practice with respect to that bargaining unit. . . . It is undisputed that [Sunrise] voluntarily recognized the Union as the exclusive bargaining representative of the LDOs on the four vessels. . . . [T]he 1981 collective-bargaining agreement (as modified by successive [agreements]) remained in force when [Sunrise] acquired the vessels, and George Pasha assured the Union that [Sunrise] would assume and abide by the collective-bargaining agreement.

J.A. 25-26 (citations omitted).

Notably, Sunrise never argued to the ALJ, nor did it offer evidence to support any claim that either it or the predecessor employers always *believed* that the LDOs constituted a supervisors-only unit.

### D. Sunrise's Exceptions to the Board

Sunrise filed exceptions to the ALJ's decision, claiming for the first time that "[t]here is no dispute that since at least 1981, the parties' collective bargaining agreement unambiguously states the parties' mutual intent and understanding that the [LDO]s—including the Second and Third Mates—*are* statutory Supervisors." Petitioner's Br. 18 (citation omitted) (emphasis added). However, Sunrise did not argue that any subjective understanding that Sunrise or its predecessors may have had about the supervisory status of the LDO unit would, in and of itself, strip the Board of jurisdiction over the case.

In response to Sunrise's exceptions, the Union contended that the parties had never agreed that LDOs were part of an all-supervisors unit. *Id*.

### E. The Findings of the Board Majority

In response to Sunrise's exceptions, a two-member majority of the Board determined that it "need not engage in an analysis of whether individuals in the several LDO classifications possess any of the supervisory indicia enumerated in Section 2(11) of the [NLRA]." J.A. 5. The majority accepted the ALJ's findings that Sunrise had recognized the Union, agreed to the CBA, and refused to provide information or arbitrate pursuant to the terms of the CBA. The majority did not dispute the ALJ's factual findings that the second and third mates *are in fact* employees, not

statutory supervisors. And the majority did not contest the settled law that an employer is bound by its voluntary recognition of a mixed unit of employees and supervisors. The majority simply dismissed the complaint without passing on the merits of the ulp charges, ruling that because Sunrise always *believed* that the bargaining unit consisted only of statutory supervisors, it had no duty to bargain with the Union. The majority held that Sunrise's apparent *belief* stripped the Board of jurisdiction over the case.

Pointing to the majority opinion's lack of any "support in the [NLRA] or its policies, in Board or judicial precedent, or in the record in this case," the dissenting member of the Board predicted the majority's decision would "sink" on judicial review. J.A. 6, 11. The Union now petitions for review.

## II.  ANALYSIS

### A.  Standard of Review

"Judicial review of NLRB determinations in unfair labor practice cases is generally limited, but not so deferential that the court will merely act as a rubber stamp for the Board's conclusions. Board orders will not survive review when the Board's decision has no reasonable basis in law or when the Board has failed to apply the proper legal standard. A Board's decision will also be set aside when it departs from established precedent without reasoned justification or when the Board's factual determinations are not supported by substantial evidence." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445-46 (D.C. Cir. 2004) (cleaned up); *see also Hawaiian Dredging Constr. Co., Inc. v. NLRB*, 857 F.3d 877, 881 (D.C. Cir. 2017). Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Micro Pac. Dev. Inc. v. NLRB*, 178 F.3d 1325, 1329 (D.C. Cir. 1999) (citation omitted). We are obligated to assess the "'whole record,'" including "'whatever in the record fairly detracts from'" the NLRB's decision. *Tenneco Auto., Inc. v. NLRB*, 716 F.3d 640, 647 (D.C. Cir. 2013) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Furthermore, "judicial deference is not warranted where the Board fails to adequately explain its reasoning, or where the Board leaves critical gaps in its reasoning." *David Saxe Prods., LLC v. NLRB*, 888 F.3d 1305, 1311 (D.C. Cir. 2018) (cleaned up). When the Board fails to explain or acknowledge its deviation from established precedent, we vacate its decision as arbitrary and capricious. *See Manhattan Ctr. Studios, Inc., v. NLRB*, 452 F.3d 813, 816 (D.C. Cir. 2006).

### B. The Board Erred in Purporting to Decide an Issue That Was Never Raised With the ALJ

"It is a basic tenet of administrative law that each party to a formal adjudication must have a full and fair opportunity to litigate the issues to be decided by the agency," *Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 116 (D.C. Cir. 1996), because otherwise, "the record developed with regard to that issue will usually be inadequate to support a substantive finding in [the proponent's] favor," *id*. The law is clear that "notice adequate to provide a fair opportunity to defend on [an] issue" must "occur[] *before* the record is closed," and that the Board generally should not consider significant issues that the parties failed to raise. *Id*.; *see Collective Concrete, Inc. v. NLRB*, 786 F. App'x 266, 267 (D.C. Cir. 2019) (declining to review issues not presented to the ALJ); *Chicago Local No. 458-3M v. NLRB*, 206 F.3d 22, 24 n.1 (D.C. Cir. 2000) (an issue that "the parties did not litigate . . . before the ALJ" was "not properly before the court").

14

Here, Sunrise alleged that all LDOs are *in fact* supervisors. As explained above, the ALJ reviewed the record and concluded that second and third mates are *in fact* statutory employees, not supervisors. The Board disregarded Sunrise's allegations, ignored the ALJ's principal findings, and gave no heed to controlling precedent in purporting to hold that it lacked jurisdiction because Sunrise *believed* it had consented to a unit "consisting entirely of supervisors excluded from coverage under the [NLRA]." J.A. 5. Neither the litigants nor the ALJ were on notice that the Board would focus on this issue. More fundamentally, no party had the opportunity to present evidence before the ALJ regarding Sunrise's *beliefs*, and the ALJ never considered the matter. The greatest irony is that the Board majority either accepted as accurate the ALJ's findings or did not dispute any of the ALJ's principal conclusions.

When the Board majority departed from the case that had been presented to the ALJ and focused instead on a significant issue that had never been raised before the ALJ, it arbitrarily and inexcusably denied the parties a full and fair opportunity to be heard on the merits of the ulp charges. This alone is grounds to reverse the Board decision. There is more, however.

### C. The Board Created a New Rule That Lacks Reasoned Justification

Beyond disregarding the case presented to the ALJ, the Board majority decided this case based on a rule untethered to established law, the parties' claims, and the record. Neither the Board nor any reviewing court has ever found that an employer's unannounced *belief* about the supervisory status of employees determines the Board's jurisdiction. If anything, Board precedent suggests the opposite. *See Gratiot Cmty.*

*Hosp.*, 312 NLRB 1075, 1075 n.2 (1993); *Arizona Elec. Power Coop., Inc*., 250 NLRB 1132, 1133-34 (1980). And nothing in the NLRA instructs the Board to consider parties' *beliefs* as part of its jurisdictional analysis. Furthermore, what the Board majority *surmised* that Sunrise *believed* is not what Sunrise argued that it believed before the ALJ. Indeed, Sunrise did not make any arguments before the ALJ about its subjective beliefs. In particular, it never argued before the ALJ or the Board that its subjective beliefs should play a dispositive role in the Board's jurisdictional analysis. Therefore, the Board effectively decided this case not only on a new rule of law but on a position never fathomed by the ALJ or the parties.

While "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see NLRB v. CNN Am., Inc*., 865 F.3d 740, 748 (D.C. Cir. 2017) (declining to enforce a Board order that "appear[ed] to be inconsistent with its precedents, without addressing those precedents or explaining why they do not govern"); *see also Dupuy v. NLRB*, 806 F.3d 556, 562 (D.C. Cir. 2015). The explanation "must at least display awareness that [the Board] is changing position and show that there are good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221 (cleaned up); *see FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). And it must acknowledge that "longstanding policies may have engendered serious reliance interests that must be taken into account," as failure to do so renders the new rule arbitrary and capricious. *Dep't of Homeland Security v. Regents of Univ. of Calif*., 140 S. Ct. 1891, 1913 (2020) (cleaned up).

Under the Board's new rule, employees may lose the protections of the NLRA not because they are *in fact* uncovered by the Act, but because their employer asserts a *belief* that they

are supervisors. Although the ALJ found, and the Board did not dispute, that the second and third mates *are in fact* employees covered by the NLRA, the Board majority found that the LDOs have no enforceable rights under the NLRA to be free from ulps simply because some members of the Board assumed that the employer always *believed* that all LDOs were supervisors. Apart from finding no support in established law, the rule makes little sense. If allowed to stand, the Board's new rule might easily destabilize established bargaining relationships and encourage unseemly strategic litigation. The rule propounded in the majority opinion would allow any employer or union to challenge the jurisdiction of the Board (and thereby aim to deny employees their rights under the Act) simply by asserting that company or union representatives *believed* all workers in the bargaining unit did not meet the statutory definition of an "employee."

The Board adopted its new rule with no regard for the parties' reliance interests. The Board did not consider the sweeping impact of its new rule or explain why existing case law does not govern. It did not acknowledge – much less justify – its adoption of a new rule, and it afforded the affected parties no opportunity to address it or offer relevant evidence. Thus, we are left with no choice but to vacate the Board's arbitrary and capricious decision for want of reasoned decision making.

### D. The ALJ's Findings of Fact Are Uncontested and Thus Dispositive

There can be no doubt that determining supervisory status requires a heavily fact-intensive analysis of the record to determine *actual*, not believed, exercises of authority. *See Jochims v. NLRB*, 480 F.3d 1161, 1168 (D.C. Cir. 2007). As discussed above, after meticulously reviewing disciplinary records, testimony, and other evidence, the ALJ found that

second and third mates are *in fact* statutory employees because they "have no authority to hire/fire, discipline or recommend discipline, transfer, lay off, promote or suspend, schedule, reschedule, recall or assign any LDOs." J.A. 41. The ALJ found that Sunrise voluntarily agreed to bargain with the Union as the LDOs' bargaining agent and "admitted that it recognized the Union as the exclusive collective-bargaining representative for the LDOs." J.A. 42. Accordingly, the ALJ reasonably concluded that the LDOs form an "appropriate bargaining unit" over which "the Board retains jurisdiction." J.A. 42.

No party has questioned the ALJ's finding that the 1981 CBA is still in effect and that the parties voluntarily agreed to it. Nor has any party attempted to undermine the ALJ's finding that Sunrise is an employer within the meaning of NLRA Section 2(2) and the Union is a labor organization within the meaning of NLRA Section 2(5). Indeed, the Board itself left untouched the ALJ's finding that second and third mates *are* employees within the meaning of NLRA Section 2(3). Thus, on the record before us, the LDO unit *is in fact* a voluntarily recognized mixed bargaining unit protected by the NLRA. The Board's decision to stray from that record and rest its holding on what the majority surmised about Sunrise's *beliefs* cannot stand.

### E.  The Board Majority's Attempt to Justify Its Position Cannot Withstand Scrutiny

The Board majority began its analysis by acknowledging NLRB precedent establishing that an employer has a duty to bargain with a voluntarily recognized "mixed" bargaining unit. J.A. 25 (citing *Union Plaza Hotel & Casino*, 296 NLRB 918 (1989), *enforced sub nom. E.G. & H. Inc. v. NLRB*, 949 F.2d 276 (9th Cir. 1991)). The majority opinion does not question the controlling law that, after voluntarily recognizing a mixed

unit, an employer may neither invoke the mixed nature of the unit as a defense to any ulp charge, nor assert that the Board would not have certified the unit in the first place. However, the majority opinion effectively casts aside this controlling case law because, in its view, the ALJ failed to "address the threshold question of what type of unit [Sunrise] voluntarily recognized." J.A. 26. It holds that because Sunrise somehow failed to understand that the LDO unit was mixed, it did not consent to a mixed unit. In attributing this *belief* to Sunrise, the majority presents arguments and offers findings that no party raised or addressed in the hearing before the ALJ. The justifications offered to bolster the majority opinion are plainly specious.

First, the Board majority attempted to ground its "threshold question" analysis in NLRB precedent. But the sole case it discussed – *Virginia Mason Hospital* – provides no support for its position. 357 NLRB 564 (2011). *Virginia Mason* neither discusses parties' beliefs about workers' supervisory status nor suggests that an employer may avoid a present bargaining obligation by belatedly asserting a mistaken belief about a bargaining unit's composition. *See generally id*. Indeed, we can find no case law, and the Board offers nothing, suggesting that Sunrise should be excused for its alleged error. Rather, case precedent is clear that when parties execute a collective bargaining agreement "with full knowledge of the nature of the present duties" of all those covered by the contract, parties are bound by the agreement. *Arizona Elec. Power Coop.*, 250 NLRB at 1133. Sunrise is charged with knowledge of the duties of its employees. *See id.* Sunrise's purported mistaken belief does not controvert the evidence in the record regarding the actual character of LDOs' work as employees, not supervisors.

The Board majority opinion also asserts that the parties must have *believed* all LDOs are supervisors because the text of the CBA refers to LDOs' duties as "supervisory." J.A. 26. But case precedent makes clear that merely labelling a position supervisory does not transform an employee into a supervisor for the purposes of the NLRA. *See Oakwood Healthcare, Inc.*, 348 NLRB 686, 688, 690 n.24 (2006). "Job descriptions, job titles, and similar paper authority, without more, do not demonstrate supervisory authority." *G4S Regulated Sec. Sols.*, 362 NLRB at 1072-73 (cleaned up). Contrary to the majority opinion, the Board was not free to ignore its duty to engage in a fact-intensive analysis to determine the actual status of second and third mates, and these employees are not "supervisors" merely because the CBA uses the term descriptively. Notably, the CBA does not state that the parties intended for the LDOs to be treated as statutory supervisors under Section 2(11) of the Act, nor does it recite or refer to the statutory criteria for determining supervisory status. And there is nothing in the record to suggest that Sunrise said or did anything that would have put the Union on notice that Sunrise supposedly *believed* that the unit consisted only of statutory supervisors and that the parties' relationship was not governed by the NLRA.

The Board majority opinion also surmises that the parties' collective bargaining relationship must have always existed "outside the aegis of the [NLRA]," based on three findings: (1) the Union had not, until now, "invok[ed] the [NLRA] or involv[ed] the Board" in the parties' 40-year relationship, J.A. 26; (2) federal courts in the 1970s and '80s found – and the Union itself once argued – that all LDOs are supervisors, J.A. 26 & n.7, 27; and (3) the Union was never certified under the NLRA. These arguments are unpersuasive.

*First*, as amici explain, "the absence of Board charges could be evidence that a collective bargaining relationship is working as the statute intended rather than that the union believed the workers have no statutory rights." Amicus Br. 18. In other words, a lack of ulp charges or other NLRB involvement does not prove that the NLRA is inapplicable.

*Second*, the supervisory status of LDOs aboard ships in the 1970s and '80s is irrelevant here, where the ALJ specifically found – based on the record *in this case* – that some LDOs are employees. And even if the facts of the cited cases had any bearing here, the Board majority inexplicably ignored countervailing evidence that technological advances in the last several decades have transformed the roles of LDOs.

*Third*, the law is clear that an employer is bound by its acceptance of a labor agreement for a mixed unit *even if* the unit is one that the NLRB would not have certified in a Board-conducted election. *See Loomis Armored US, Inc.*, 364 NLRB No. 23 (2016). Employers seeking to renege on bargaining obligations cannot simply point out that a Section 9 election never occurred; instead, they must establish a good faith reasonable doubt about the union's continuing majority support. *Allentown Mack Sales and Serv., Inc. v. NLRB*, 522 U.S. 359, 364, 372 (1998). This is true where, as here, the employer assumed a CBA as a successor employer. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 44 (1987).

The majority opinion also suggests that the "practicalities of operating large vessels on the open seas" lends support to its finding that Sunrise only "consented to a supervisory unit." J.A. 26. The opinion notes, for example, that the LDOs worked and slept separately from unlicensed crewmembers. J.A. 26. However, the majority's reliance on cherry-picked practices is

based on its erroneous conflation of maritime practices and labor law. Pointing to crewmembers' sleeping arrangements – or even pointing to authority they may have wielded "to demand obedience" from other officers – simply "doesn't answer the questions posed by the 2(11) indicia of supervisory status." *Brusco Tug & Barge*, 359 NLRB 486, 493 (2012), *aff'd* 696 F. App'x 519 (D.C. Cir. 2017).

Finally, it is worth noting that it is implausible to imagine that Sunrise would not have adopted the same position as the Board majority if the employer thought there was any truth to the claim that it always *believed* that the LDO unit consisted of only supervisors. If Sunrise had truly *believed* that all LDOs aboard its own ships were supervisors and thought this *belief* was a significant consideration, we assume that Sunrise would have tried to press the point before the ALJ. It did not. Rather, Sunrise claimed only that the LDOs are *in fact* supervisors, a position that not even the Board majority opinion embraces.

## III.   CONCLUSION

On the record before us, we find that the Board's position, as reflected in the Board majority opinion, lacks support in the record, defies established law, and creates a new rule without reasoned justification. It therefore fails substantial evidence review and is arbitrary and capricious for want of reasoned decision making. We also find that the arguments advanced by Sunrise find no support in the record or in controlling precedent. We therefore grant the petition for review, vacate the Board's decision, and remand the case for reconsideration consistent with this opinion.

*So ordered.*