# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 3, 2017                    Decided June 9, 2017

No. 16-1316

KING SOOPERS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 16-1367

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Raymond M. Deeny* argued the cause for petitioner. With him on the briefs was *Jonathon M. Watson*.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

Before: GARLAND, *Chief Judge*, GRIFFITH, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

EDWARDS, *Senior Circuit Judge*: Petitioner King Soopers, Inc. ("King Soopers" or "the Company") owns and operates a grocery store in Denver, Colorado, where its employees are represented by the United Food and Commercial Workers, Local 7 ("Union"). Wendy Geaslin was a member of the Union who worked as a barista at the Starbucks kiosk located inside of the store until she was terminated in May of 2014. Geaslin filed a charge with the National Labor Relations Board ("NLRB" or "the Board"), and the Board's General Counsel issued a complaint against the Company asserting multiple violations of the National Labor Relations Act ("the Act").

Following a hearing before an Administrative Law Judge ("ALJ"), the Board held that King Soopers had violated Sections 8(a)(1) and (3) of the Act by twice suspending and finally discharging Geaslin for engaging in protected activity, and, additionally, violated Section 8(a)(1) of the Act by unlawfully interrogating Geaslin about complaints that she raised with the Union. The Board ordered the Company, *inter alia*, to reinstate Geaslin with make-whole relief.

In providing make-whole relief for Geaslin, the Board ordered the Company to reimburse her for search-for-work and interim employment expenses regardless of whether those expenses exceeded her interim earnings. In the past, the Board had declined to award search-for-work and interim employment expenses that exceeded a complainant's interim earnings, but the Board acknowledged that it had never explained or justified its approach. In this case, the Board found that its traditional approach not only failed to make victims of unlawful discrimination whole, but also likely discouraged complainants in their job search efforts. The Board thus

concluded that its new remedial framework was necessary to ensure that make-whole remedies fully compensated unlawfully discharged employees for the losses they incurred and deterred further violations of the Act.

In its petition for review, the Company argues that the Board's decision should be set aside on four principal grounds: (1) the Board erred by not deferring to the grievance/arbitration procedures adopted by the Company and Union in their collective bargaining agreement; (2) the Board erred in adopting the ALJ's credibility determinations and in finding that the Company violated the Act by interrogating, twice suspending, and terminating Geaslin; (3) the Board erred in permitting the General Counsel to amend the Complaint twice to add a request for an enhanced remedy and to add the unlawful interrogation charge; and (4) the Board erred in expanding the Act's remedies to include search-for-work and interim employment expenses regardless of an alleged discriminatee's interim earnings. We agree with the Company that the Board's determination that King Soopers unlawfully interrogated Geaslin must be vacated because this charge was not added to the General Counsel's complaint until after the commencement of the hearing before the ALJ. The Company thus had no reasonable notice of the interrogation charge or a fair opportunity to defend itself. We find no merit in King Soopers' remaining claims.

We grant the Board's cross-application for enforcement as to all matters except the finding that the Company violated the Act when it allegedly interrogated Geaslin about complaints that she raised with the Union. We grant the Company's petition for review on the interrogation charge, but deny the petition for review as to all other matters.

## I.  Background

Two collective bargaining agreements ("CBAs") cover the employees at the King Soopers grocery store where the events in this case occurred. The "Meat Agreement" primarily applies to workers in the meat, deli, and seafood departments. The "Retail Agreement" covers the Company's retail workers and clerks, including those whose duties involve bagging sold merchandise. The contracts generally restrict bargaining unit work to members of the respective units. Article 2, Section 2 of the Meat Agreement states that "[a]ll work performed in the meat, delicatessen and seafood department(s) will be done by members of the bargaining unit." Similarly, Article 2, Section 2 of the Retail Agreement states that "[a]ll work and services performed in the bargaining unit connected with the handling or selling of merchandise to the public shall be performed exclusively by bargaining unit members." However, both Agreements allow employees to perform "incidental" work outside of their classification.

Geaslin worked for King Soopers from August 2009 until May 21, 2014. As a barista in the coffee department, she was covered by the Meat Agreement. In the months leading up to her termination, Geaslin and her supervisor, Theresa Pelo, had a number of disagreements regarding Geaslin's work responsibilities. These disputes eventually led to Geaslin's discharge.

In March of 2014, Geaslin complained to her coworker, Latrice Jackson, about the Company's practice of sometimes requiring baristas to help the bakery department prepare its products for sampling. Geaslin did not know it at the time, but Jackson was a Union steward and brought these complaints to the attention of King Soopers management. Pelo allegedly asked Geaslin whether she had complained to the Union. When

Geaslin denied having done so, Pelo accused her of failing to tell the truth. However, no action was taken by the Company against Geaslin with respect to this matter.

On May 9, 2014, when the supermarket was very busy, Pelo instructed available employees, including baristas, to help bag groceries. Geaslin informed Pelo that she was scheduled to take her lunch break, but Pelo told her to first assist with groceries. Geaslin then questioned whether she should be bagging groceries at all, based on her understanding of the applicable terms of the collective bargaining agreement. Pelo again ordered Geaslin to bag groceries. While some facts were disputed, the Board determined that Geaslin walked towards the checkout station to do as instructed, but raised her hands in the air and commented that she was just asking about her lunch break. Pelo then called Geaslin back to her to continue talking. At Geaslin's suggestion, the two went to Pelo's office, along with an assistant manager who had witnessed part of the exchange. In the office, Geaslin and Pelo engaged in a heated discussion. Pelo accused Geaslin of refusing to bag groceries. Geaslin asserted that she had been on her way to bag when Pelo stopped her. Geaslin also continued to insist that she should not be required to pack groceries under the terms of her CBA. Pelo then placed Geaslin on a five-day suspension for insubordination. Geaslin responded by contacting her Union representative, Danny Craine.

On May 14, Geaslin and Craine met with Pelo and two other managers to discuss Geaslin's suspension. This meeting was also contentious, and both Geaslin and Pelo became agitated. Pelo admitted that Geaslin was not supposed to bag groceries under the terms of the CBA, but again accused her of refusing to listen to the instructions that were given to her on May 9. Geaslin, in turn, insisted that she had not refused to follow Pelo's instruction, and Craine asserted that requiring

Geaslin to bag groceries violated the applicable terms of the CBA. During the course of the discussion, Geaslin also made facial expressions which Pelo took to be disrespectful. The meeting ended with Pelo placing Geaslin on a second five-day suspension based on Geaslin's allegedly insubordinate behavior during the meeting. Subsequently, on May 21, Pelo met with Geaslin and Craine and advised them that Geaslin was being terminated due to her "gross misconduct" during the May 14 meeting.

Geaslin filed a grievance pursuant to the procedures in the parties' collective bargaining agreement. The Company denied the grievance. Geaslin then presented her grievance to the Union's Executive Grievance Committee, which decided not to pursue it. Geaslin appealed this decision to the Executive Board of the Union, which declined to appeal the grievance to arbitration. Union officials never explained on the record their reasons for declining to pursue Geaslin's grievance.

Geaslin then filed unfair labor practice charges with the NLRB. The General Counsel issued a complaint against King Soopers, accusing it of violating Sections 8(a)(1) and (3) of the Act by twice suspending and then terminating Geaslin in response to her protected activity. The General Counsel later moved to amend the complaint twice. The first motion, made five days prior to the hearing, sought to expand the remedies available to Geaslin to include reimbursement for all search-for-work and work-related expenses, regardless of her interim earnings. Later, during the course of the hearing before the ALJ, the General Counsel moved to amend the complaint to assert that Pelo had unlawfully interrogated Geaslin about her union activities in March of 2014. The ALJ allowed both amendments and also denied King Soopers' motion to defer the charges to the grievance/arbitration procedures in the parties' collective bargaining agreement.

The ALJ found King Soopers had committed the unfair labor practices as alleged, and the Board largely endorsed the ALJ's rulings, findings, and conclusions. The Board determined that Pelo had unlawfully questioned Geaslin about her Union-related activity in March. It also held that Geaslin had engaged in protected activity on May 9 when she questioned whether she should bag groceries, and on May 14 when she and Craine met with the Company's managers. Applying the test from *Atlantic Steel Co.*, 245 NLRB 814 (1979), the Board stated that Geaslin's "conduct during the May 9 and 14, 2014 meetings did not cause her to lose the protection of the Act." *King Soopers, Inc.*, 364 NLRB No. 93, at 3 (2016). The Board therefore found that the Company had violated the Act by twice suspending and finally terminating Geaslin in response to her protected activity.

Much of the Board's decision is devoted to the "search-for-work and work-related expenses" make-whole remedy. Prior to the Board's decision in this case, recovery of these expenses was limited by a worker's interim earnings. However, as noted above, the Board acknowledged that it "ha[d] never provided an explanation or reasoned policy rationale for its" approach. *Id.* at 5.

In addressing the make-whole remedy question, the Board found that "[t]he practical result of [its] traditional approach has been less than make-whole relief for the most seriously aggrieved victims of unlawful conduct, contrary to the central remedial principle underlying the Act." *Id.* The Board concluded that amending its approach would better effectuate the purposes of the Act, and would additionally deter bad behavior without running afoul of the Act's prohibition on punitive damages. *Id.* at 5–7. Member Miscimarra dissented from the Board's remedial change.

King Soopers petitioned for review, and the Board cross-applied for enforcement. We have jurisdiction to decide this case pursuant to 29 U.S.C. §§ 160(e) and (f).

## II. Analysis

### A. *Standard of Review*

It is well understood that we may set aside a decision of the Board "when it departs from established precedent without reasoned justification, or when the Board's factual determinations are not supported by substantial evidence." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004) (citations omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Micro Pac. Dev. Inc. v. NLRB*, 178 F.3d 1325, 1329 (D.C. Cir. 1999). Pursuant to this standard, we will reverse a judgment of the Board "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (quotation marks omitted) (quoting *United Steelworkers of Am. v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993)). In evaluating the record, we "accept all credibility determinations made by the ALJ and adopted by the Board unless those determinations are 'patently insupportable.'" *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (quoting *Traction Wholesale Ctr. Co. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000)).

It is also well understood that the Board has broad authority to allow amendments to complaints, but this mandate "is limited by fundamental principles of fairness." *Bruce Packing Co. v. NLRB*, 795 F.3d 18, 23 (D.C. Cir. 2015).

Finally, a remedy "will not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216 (1964) (quoting *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943)).

**B.** ***The Board Was Not Obliged to Defer to the Negotiated Grievance and Arbitration Procedures Adopted by the Company and Union in Their CBA***

As a threshold matter, the Company asserts that the Board was required to defer this matter to the grievance and arbitration procedures outlined in the CBA covering Geaslin. We disagree. On the facts of this case, the Board reasonably found that deferral was inappropriate.

The Board has long declined to adjudicate disputes that are better resolved pursuant to the terms of grievance/arbitration procedures adopted by employers and unions in their collective bargaining agreements.

> [I]t was long ago recognized by the Board that it was contrary to the purposes of the [Act] for the Board to assume the role of policing collective contracts between employers and labor organizations by attempting to decide whether disputes as to the meaning and administration of such contracts constitute unfair labor practices under the Act. . . . [T]here has been a historical acceptance of arbitration as a legitimate means of resolving labor disputes. Simply stated, the Board's willingness to defer to arbitration reflects the underlying conviction that the parties to a collective-bargaining agreement are in the best position to resolve, with the help of a

> neutral third party if necessary, disputes concerning the correct interpretation of their contract.

Harry T. Edwards, *Deferral to Arbitration and Waiver of the Duty to Bargain: A Possible Way Out of Everlasting Confusion at the NLRB*, 46 OHIO ST. L.J. 23, 24–25 (1985) (footnotes and quotation marks omitted) (discussing the early evolution of the Board's deferral doctrine).

Over the years, the deferral doctrine has expanded to include a number of situations in which purported unfair labor practices are subject to resolution pursuant to the parties' contractual grievance procedures.

- If a CBA explicitly provides for arbitration of what might be an unfair labor practice charge, *see Babcock & Wilcox Constr. Co.*, 361 NLRB No. 132, at 13 (2014), "the Board will not pursue unfair labor practice proceedings until arbitration has run its course." *DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 438 (D.C. Cir. 2002) (discussing *Collyer Insulated Wire*, 192 NLRB 837 (1971)). As the Board has explained, "[w]here an employer and a union have voluntarily elected to create dispute resolution machinery . . . it is contrary to the basic principles of the Act for the Board to jump into the fray prior to an honest attempt by the parties to resolve their disputes through that machinery." *United Techs. Corp.*, 268 NLRB 557, 559 (1984).

- Relatedly, the Board will not pursue unfair labor practice charges if an employee, who is free to do so, has declined to exhaust all available contractual grievance procedures. *See Gen. Dynamics Corp.*, 271 NLRB 187 (1984). In *General Dynamics*, an employee

grieved his discipline, but only completed four of the five steps outlined in the CBA. *Id.* Prior to arbitration, he withdrew his grievances and filed a charge with the Board. The Board deferred the case based on the "fundamental . . . concept of collective bargaining that the parties to a collective-bargaining agreement are bound by the terms of their contract." *Id.* at 189 (quoting *United Techs. Corp.*, 268 NLRB at 559). The Board thus declined to pursue the unfair labor practice charges of the employee in a situation in which the employee had declined to pursue the contract procedures that were available to address his claims.

• The Board will also accept the results of arbitration, so long as the arbitrator's decision meets certain criteria. *See Babcock & Wilcox*, 361 NLRB No. 132, at 5.

• Deferral is required when there has been a full and fair final disposition of a grievance that is rendered pursuant to a grievance procedure in the parties' CBA, whether or not the matter was appealed to formal arbitration. *See Am. Freight Sys. v. NLRB*, 722 F.2d 828 (D.C. Cir. 1983). In *American Freight*, an employee "pursued a contract grievance claim . . . over precisely the same question that was subsequently presented to the NLRB." *Id.* at 829. Pursuant to the terms of the CBA between the union and employer, a "Grievance Committee" composed of three union and three employer representatives conducted a full hearing and rejected the employee's claim. *Id.* at 830. The employee then filed an unfair labor practice charge with the Board, which refused to defer the matter. We held that the Board's decision was an abuse of discretion because "the Grievance Committee's decision satisfied all of the Board's deference requirements." *Id.* at 832.

- Deferral is likewise appropriate where there is a pre-arbitration settlement agreement, so long as certain requirements are met. *See Babcock & Wilcox*, 361 NLRB No. 132, at 13 (discussing and modifying the doctrine set out in *Alpha Beta*, 273 NLRB 1546 (1985), and *Postal Serv.*, 300 NLRB 196 (1990)).

The situation in this case does not fit any of these deferral paradigms. Therefore, there is no controlling precedent that required the Board to defer in this case. Furthermore, we agree with the Board that it acted reasonably in declining to defer Geaslin's unfair labor practice charges to the grievance procedures in the CBA. Geaslin made every effort to pursue her grievances under the CBA, but she was rebuffed. Given these circumstances, the Board surely was not required to defer in this case.

After being discharged, Geaslin filed a grievance, which was denied by the Company. She then appealed the matter to the Executive Grievance Committee of the Union, seeking to have her claims pursued in arbitration. This Committee denied her request, with no explanation on the record. The Union's Executive Board denied her appeal, with no explanation on the record. The Union simply informed Geaslin that it had "considered [her] request to have [her] grievance arbitrated . . . . [and] it was the decision of the [Executive] Board to deny the same." Joint Appendix ("JA") 805. Geaslin then filed unfair labor practice charges with the NLRB.

King Soopers argues that the Board should have dismissed the charges filed by Geaslin because "the parties mutually resolved Geaslin's grievance," and the merits of her claims had been considered and resolved pursuant to the parties' contractual grievance procedure. Br. of Pet'r at 26. In other words, the Company asserts that the Board should have

13

deferred to the disposition of the claims in the grievance procedure. We disagree.

Geaslin did not withdraw her grievances. Quite the contrary. She attempted to exhaust the procedures available to her under the contract. The Union, however, blocked her request to arbitrate the case. There were thus no further contractual proceedings to which the Board could have deferred. Therefore, this case is not comparable to the deferral patterns endorsed in *Collyer Insulated Wire*, 192 NLRB 837, and *General Dynamics*, 271 NLRB 187. In addition, there was no settlement agreement between the parties here, nor was there any arbitration decision. *See Babcock & Wilcox*, 361 NLRB No. 132, at 5, 13. And, importantly, Geaslin's grievances were not resolved on the merits pursuant to an agreed-upon Company-Union disposition process outlined in the contract. *See Am. Freight*, 722 F.2d 828.

It is true that Union and Company officials were of a like mind in determining that the grievance matter should be dismissed and that there should be no arbitration of Greaslin's claims. They were free to do this under the terms of the CBA. Nevertheless, there is no clear record evidence to explain why the Union declined to pursue Geaslin's grievances. As the Board found, the record contains only Geaslin and Craine's speculation as to why the Union refused to arbitrate Geaslin's claim. *See King Soopers*, 364 NLRB No. 93, at 23. In these circumstances, the Board did not abuse its discretion in holding that an employee in Geaslin's position is free to seek relief from the Board. This case might be different if, based on the terms of the CBA, the Union had assessed the employee's claim on the merits and reached a reasonable judgment that it would not pursue arbitration because the employer had acted with just cause under the CBA. But that is not this case. Therefore, the

Board reasonably determined that it would not be appropriate to defer.

## C. *The Board Did Not Err in Adopting the ALJ's Credibility Determinations*

Over exceptions by the Company, the Board adopted the ALJ's witness credibility findings in full. *King Soopers*, 364 NLRB No. 93, at 1 n.1. The Company asserts that the Board erred in doing so because the ALJ's determinations were not based on reasoned analysis. We reject this argument.

Courts "accept all credibility determinations made by the ALJ and adopted by the Board unless those determinations are 'patently insupportable.'" *Inova Health Sys.*, 795 F.3d at 80 (quoting *Traction Wholesale Ctr.*, 216 F.3d at 99). This high bar is not met here. The ALJ clearly explained her decisions to credit and discredit the testimony of various witnesses. In making her findings she relied on important contextual factors, including demeanor, her knowledge of industrial practices, the record, and the presence of consistencies or inconsistencies in a witness' story. There is nothing here to suggest that the ALJ's credibility findings are "hopelessly incredible," "self-contradictory," or "patently insupportable." *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998) (citations and quotation marks omitted).

## D. *The Board Erred in Finding That the Company Interrogated Geaslin in Violation of the Act*

The Board held that the Company violated Section 8(a)(1) of the Act when Pelo questioned Geaslin about whether she had complained to the Union about baristas being required to help the bakery department prepare its products for sampling. This charge was only added to the complaint, however, at the close

of the General Counsel's case in chief. The Board nonetheless allowed the charge to be added. The Company asserts that the finding of unlawful interrogation should be set aside because the charge was added to the complaint too late and, also, because there is no substantial evidence to support the charge. We agree that the Board erred in granting the General Counsel's motion to amend. Therefore we need not address whether substantial evidence in the record supports the Board's finding that the Company committed an unfair labor practice when it allegedly interrogated Geaslin.

The Board may amend a complaint "in its discretion at any time prior to the issuance of an order based thereon," 29 U.S.C. § 160(b), but this "provision is limited by fundamental principles of fairness." *Bruce Packing Co.*, 795 F.3d at 23. The Board therefore "allows amendments only if they are 'just,'" examining "three factors: (1) whether there was surprise or lack of notice, (2) whether the General Counsel offered a valid excuse for its delay in moving to amend, and (3) whether the matter was fully litigated." *Stagehands Referral Serv., LLC*, 347 NLRB 1167, 1171 (2006). These circumstances are all missing from this case.

King Soopers had no fair notice of the interrogation charge, which was only added in the middle of the hearing before the ALJ. The General Counsel provided no valid excuse for the delay in adding the charge. In fact, the General Counsel had access to all of the relevant information necessary to investigate this charge for nearly a full year before the hearing, but nevertheless did not include the charge in the initial complaint. And, finally, the issue was not fully litigated. While the Company cross-examined Geaslin, it never did so while armed with the knowledge that it was defending itself against an unfair interrogation charge.

The Board held that "the [Company] had the opportunity to fully litigate this allegation because the amendment was made mid-trial, giving the [Company] the opportunity to call Geaslin as a witness." *King Soopers*, 364 NLRB No. 93, at 1 n.1. Although in some cases an employer may be able to fully litigate a matter by recalling a witness, this is not such a case. Geaslin, the victim of King Soopers' alleged unfair labor practices, was the key witness of the entire trial, and counsel for King Soopers had just cross-examined her without any knowledge of a potential interrogation charge. In this situation, we cannot conclude that King Soopers' ability to later recall Geaslin mitigates the prejudice created by the late amendment. *Cf. Bruce Packing Co.*, 795 F.3d at 23.

To be sure, mid-trial amendments by the General Counsel are not categorically unfair. But in light of the confluence of factors in this case – a lack of any notice for the employer; an unexcused delay by the General Counsel despite ample time to investigate the charge; and an amendment postdating the employer's cross-examination of the General Counsel's pivotal witness – this amendment was impermissible. We therefore set aside the Board's finding that the Company committed an unfair labor practice by unlawfully interrogating Geaslin.

**E. *The Board Reasonably Found That the Company Committed Unfair Labor Practices by Suspending and Terminating Geaslin***

The Board also found that King Soopers violated the Act by punishing Geaslin for engaging in protected activity when it suspended her on May 9 and May 14, 2014, and then discharged her on May 21, 2014. The Company argues that Geaslin did not engage in protected activity on May 9 and 14, and that even if she did, she was lawfully disciplined for insubordination. The Company also asserts that the Board erred

in applying *Atlantic Steel*, 245 NLRB 814, to find that Geaslin's behavior was not so offensive that it lost the protection of the Act. We find no merit in these claims. The Board reasonably held that Geaslin's behavior on May 9 and 14 was protected, and substantial evidence supports its determination that the Company punished her in response to that activity.

**1. The Board reasonably found that Geaslin engaged in protected activity on May 9 and May 14, 2014**

Determining whether a worker's behavior is protected under Section 7 of the Act "implicates [the Board's] expertise in labor relations," and so "a reasonable construction by the Board is entitled to considerable deference." *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984); *accord United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 913 (D.C. Cir. 2004). We defer here to the Board's "reasonable construction" regarding the events of May 9 and May 14.

On May 9, Pelo asked Geaslin to help bag groceries. Geaslin questioned whether she should be doing so under her CBA and the CBA governing retail clerks, whose duties include "bagging . . . sold merchandise." JA 448. Pelo and Geaslin then engaged in a heated discussion, which resulted in Pelo suspending Geaslin for five days.

The Board appropriately held that under *Interboro Contractors, Inc.*, 157 NLRB 1295 (1966), Geaslin's behavior was protected by the Act. *King Soopers*, 364 NLRB No. 93, at 2–3. Pursuant to the *Interboro* doctrine, an individual employee who honestly and reasonably asserts a right grounded in a CBA engages in protected activity, even if the employee later turns out to have been wrong in her construction of the contract. *City Disposal*, 465 U.S. at 839–41 (approving and applying

*Interboro Contractors*, 157 NLRB 1295). The Board agreed with the ALJ "that Geaslin's interpretation of the contract was honest and reasonable," because "it was consistent with her union representative's interpretation of the agreements, the assistant deli manager's testimony that it was unusual for employees outside the retail unit to bag groceries, and Pelo's own admission that Geaslin's duties did not include bagging groceries." *King Soopers*, 364 NLRB No. 93, at 2. Substantial evidence supports the Board's finding.

The Meat and Retail Agreements may be understood to prohibit baristas from bagging groceries. Both CBAs generally restrict bargaining unit work to members of the bargaining unit. And while the Agreements contemplate employees performing "incidental" work outside of their job classifications, this could, as the Board found, "reasonably be interpreted to permit incidental work among the enumerated [bargaining unit] classifications rather than the exchange of incidental work between [bargaining units]." *Id.* at 3. The reasonableness of Geaslin's interpretation of the contracts is underscored by the other testimony relied upon by the Board. *See id.* at 2.

King Soopers, however, asserts that Geaslin did not have an "honest and reasonable belief she was not required to sack" groceries because its "Customer First" program emphasizes service to customers above all else, Br. of Pet'r at 37, she had previously been required to assist another department, and her CBA does not contain an express provision prohibiting baristas from bagging merchandise, *id.* at 36–41. But the Company's emphasis on customer service cannot serve to wholly supplant contractual rights. And, as discussed, the CBAs can be reasonably interpreted to support Geaslin's view.

The Company next argues that "Geaslin was required to follow Pelo's work order and then file a grievance if she

believed Pelo's directive violated the CBA." *Id.* at 42. But the Board credited Geaslin's consistent testimony that she did attempt to follow Pelo's work order, but was stopped from doing so. *King Soopers*, 364 NLRB No. 93, at 23, 26–27. We have no basis to overturn this determination.

The Board also reasonably found that Geaslin's behavior on May 14 was protected. On that day, Geaslin and Craine, her Union representative, met with Pelo and two other managers to discuss the events of May 9. This meeting became contentious and resulted in Geaslin's second five-day suspension. The Board held that the protections of the Act applied to this meeting because "Geaslin continued to assert her contractual rights," and because "the May 14 meeting . . . constitute[d] a 'grievance' meeting since Geaslin and her representative met with [the Company's] managers to discuss her discipline from the week prior." *King Soopers*, 364 NLRB No. 93, at 25.

We defer to this finding as well. Craine testified that he asserted Geaslin's contractual rights on her behalf during this meeting. And the Board's determination that this was a grievance meeting was justifiable because it consisted of a conference between management, an employee, and the employee's representative to discuss a disciplinary action. The Board reasonably found that Geaslin was engaged in protected activity. *See City Disposal*, 465 U.S. at 836.

**2. The Board reasonably held that the Company punished Geaslin in response to her protected activity in violation of the Act**

The Company argues that even if Geaslin engaged in protected activity on May 9 and 14, it nevertheless did not violate the Act because it terminated her for insubordination. It also claims that the Board committed reversible error by

applying *Atlantic Steel* to the facts of this case. We find no merit in these arguments.

While employees may be punished for insubordination, they cannot be lawfully punished for misconduct that is intertwined with protected activity unless that behavior is so "opprobrious" as to "lose the protection of the Act." *Atlantic Steel Co.*, 245 NLRB at 816. As the Board has explained

> The decision as to whether the employee has crossed that line depends on several factors: (1) the place of the discussion; (2) the subject matter of the discussion; (3) the nature of the employee's outburst; and (4) whether the outburst was, in any way, provoked by an employer's unfair labor practice.

*Id.* Thus, "[a]lthough 'employees are permitted some leeway for impulsive behavior when engaging in concerted activity, this leeway is balanced against an employer's right to maintain order and respect' in the workplace." *Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22, 26 (D.C. Cir. 2011) (quoting *Piper Realty Co.*, 313 NLRB 1289, 1290 (1994)).

The NLRB applied the *Atlantic Steel* factors and determined that "[Geaslin's] conduct during the May 9 and 14, 2014 meetings did not cause her to lose the protection of the Act." *King Soopers*, 364 NLRB No. 93, at 3. The Company does not challenge the Board's application of the *Atlantic Steel* factors, but asserts that it should have instead applied the test from *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21 (1964). Under *Burnup & Sims*, an employer does not discipline an employee in violation of the Act if it demonstrates a good faith belief that the worker has committed misconduct in the course of protected activity, and the employee has actually done so. *See id.* at 23. The Company thus asserts that because Pelo honestly

believed Geaslin was being insubordinate, and Geaslin did engage in *some* insubordination, the Company did not violate the Act by disciplining Geaslin.

King Soopers misapprehends the relationship between the *Burnup & Sims* and *Atlantic Steel* tests. As we recently explained, under *Burnup & Sims* an employer's defense of good faith may be rebutted by a showing that the misconduct "was not serious enough to forfeit the protection of the [Act] and to warrant the discipline imposed." *Consol. Commc'ns, Inc. v. NLRB*, 837 F.3d 1, 8 (D.C. Cir. 2016). The Board appropriately applied *Atlantic Steel* and reached this conclusion.

The Company has presented no reason why we should reverse the Board's reasonable determination that it twice suspended and then terminated Geaslin in response to her protected activity. We therefore affirm these unfair labor practice findings.

## F. *The Board's Change to Its Make-Whole Remedial Framework Was Lawful, Reasonable, and Fully Justified*

Finally, as explained above, the Board amended its approach to make-whole relief for unlawfully-discharged employees, determining that they may recover for *all* reasonable search-for-work and work-related expenses, without any cap based on interim earnings. As a threshold matter, we hold that the Board did not err in allowing the General Counsel to amend the complaint to request expanded remedies. This amendment was added at the hearing before the ALJ, but the Board and not the ALJ decided the question regarding whether to adjust the Board's remedial policy. King Soopers had notice and a full and fair opportunity to argue the issue, and the record shows that it did so. *See King Soopers*,

364 NLRB No. 93, at 1 n.1 (listing filings submitted by the Company); *id.* at 6–9 (addressing the Company's arguments).

On the merits, King Soopers argues that the Board's decision must be vacated because it is inadequately reasoned and will lead to unfair results that are incompatible with the Act. We disagree. The Board is entitled to considerable deference in crafting remedies for unfair labor practices, and the reasons given by the Board to justify the new make-whole remedial framework pass muster.

The courts have recognized that "the Board's remedial authority is 'a broad discretionary one, subject to limited judicial review,' and a remedy 'will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'" *United Food & Comm. Workers v. NLRB*, 447 F.3d 821, 827 (D.C. Cir. 2006) (quoting *Fibreboard Paper Prods.*, 379 U.S. at 216). Pursuant to this standard, it is clear that the Board's decision in this case easily survives review.

Under its old make-whole remedial framework, the Board would not award search-for-work and interim employment expenses that exceeded a discriminatee's interim earnings, but the Board never explained or justified this approach. In support of its decision in this case, the Board offered clear, reasonable, and compelling justifications for the new remedial framework:

> Because the Board's traditional approach treats search-for-work and interim employment expenses as an offset to interim earnings, discriminatees who are unable to find interim employment do not receive any compensation for their search-for-work expenses. Similarly, discriminatees who find jobs that pay wages lower than the amount of their expenses will not

receive full compensation for the search-for-work and interim employment expenses. As expressed by amicus SEIU, "In cases of low wage workers, where the costs associated with the reasonable search for interim employment can quickly outweigh the interim pay received, if any, the employee is, in essence, subsidizing the employer's violation." An example illustrates the shortcomings of the Board's traditional approach. Juana Perez worked at a remote location earning $1,000 per month prior to her unlawful discharge. During the month following her discharge, Perez spent $500 travelling to different locations looking for work. Perez could only find interim employment in another state that paid $750 per month. Perez moved to the new state to be closer to her new job and was also required to obtain training for her new position, costing her $5000 and $500, respectively. Under the Board's traditional approach, Perez would receive compensation for only $1500 of her $6000 total expenses, far less than make-whole relief.

*King Soopers*, 364 NLRB No. 93, at 5.

The Board further explained that:

The Board's traditional approach not only fails to make victims of unlawful discrimination whole, but may also discourage discriminatees in their job search efforts. The Board imposes a duty on discriminatees to mitigate by engaging in reasonable efforts to seek and to hold interim employment. Discriminatees do not receive backpay for any periods during which they fail to mitigate. Yet, under the Board's traditional approach, discriminatees, who have already lost their source of income, risk additional financial hardship by

searching for interim work if their expenses will not be reimbursed.

Modifying the Board's treatment of search-for-work and interim employment expenses to eliminate the offset will bring these payments in line with the Board's treatment of similar expenses incurred by discriminatees. When a respondent unlawfully discharges an employee, the respondent not only deprives the employee of his or her wages, but may also cause the employee to lose benefits and to incur additional expenses. The Board compensates discriminatees for the inequity of lost wages through backpay. However, in order to make discriminatees whole, the Board also compensates discriminatees for the separate inequity of additional expenses, such as medical expenses and retirement fund contributions. The Board awards compensation for these expenses regardless of discriminatees' interim earnings and separately from taxable net backpay, with interest. Like medical expenses and retirement fund contributions, search-for-work and interim employment expenses are a direct result of a respondent's unlawful actions. No other expense incurred by discriminatees as a result of a respondent's unlawful conduct is treated as an offset to interim earnings. Thus, in order to fully compensate discriminatees for their losses, we shall treat search-for-work and interim employment expenses in a manner consistent with our treatment of other losses suffered by the discriminatee.

*Id.* at 5–6 (citations omitted).

In reaching this decision, the Board rested on its clear authority to adjust its make-whole relief frameworks as necessary to achieve the goals of the Act. Section 10(c) of the Act instructs the NLRB to take such action "as will effectuate the policies of th[e Act]." 29 U.S.C. § 160(c). One important policy goal is to achieve "a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941); *see also NLRB v. J.H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 263 (1969) ("A back pay order is . . . designed to vindicate the public policy of the statute by making the employee[] whole . . . .") (quoting *Nathanson v. NLRB*, 344 U.S. 25, 27 (1952)). And the Board has in the past adapted its scheme in order to achieve this goal. *See, e.g.*, *NLRB v. Seven-Up Bottling Co. of Miami*, 344 U.S. 344 (1953) (approving the remedial approach adopted by the Board in *F. W. Woolworth Co.*, 90 NLRB 289 (1950)). In short, both the terms of the Act and the case law construing the Act support the Board's action in this case.

In his dissenting opinion, Member Miscimarra argued that "the Board's traditional approach to compensating claimants for these expenses makes claimants whole in most cases, and the change adopted by my colleagues will result in greater than make-whole relief in other cases." *King Soopers*, 364 NLRB No. 93, at 9. Specifically, the dissent claimed that the Board's remedial change "will produce a financial windfall . . . where claimants have interim earnings that equal or exceed the sum of their lost earnings and their employment/search expenses." *Id.* at 13. The dissent also claimed, *inter alia*, that "the new standard does not adequately safeguard against the risk that awarding search-for-work and interim employment expenses, divorced from interim earnings, will tend to produce more protracted Board litigation over such expenses, particularly when such expenses are disproportionately high in comparison

to the claimants' lost earnings or interim earnings . . . ." *Id.* The Board majority found no merit in these contentions:

> Contrary to the dissent, discriminatees will not receive more than make-whole relief under the General Counsel's request, because incurring search-for-work and interim employment expenses represent a different injury than losing wages. Thus, reimbursement of these expenses compensates discriminatees for a separate injury than lost pay. As discussed above, the Board has recognized this distinction by awarding other expenses incurred by discriminatees regardless of interim earnings and separately from taxable net backpay, with interest.

> Further, even if the Board's revised remedial policy might result in a limited number of discriminatees with unusually high interim earnings receiving additional reimbursement, this fact would not cause us to reject it. In our view, such a circumstance would constitute "a permissible remedial outcome if it bears 'an appropriate relation to the policies of the Act." See *Mimbres Memorial Hospital & Nursing Home*, 361 NLRB No. 25, slip op. at 6 (quoting *NLRB v. Seven-Up Bottling Co.*, 344 U.S. at 342).

*King Soopers*, 364 NLRB No. 93, at 7. The Company resists the Board's decision because, in its view, it is bad policy and exceeds the Board's statutory authority. We reject these claims for the reasons explained by the Board. It is clear here that the Board's action in this case is well within its statutory authority.

In reaching this result, we need not decide whether a Board remedy that arguably produces what Member Miscimarra

characterized as a financial windfall – *i.e.*, in a situation in which a claimant's interim earnings equal or exceed the sum of his lost earnings and employment-search expenses – will survive review. There is nothing here to suggest that this case involves such a "windfall." *See, e.g.*, *EPA v. EME Homer City Gen., L.P.*, 134 S. Ct. 1584, 1609 (2014) ("The possibility that the rule, in uncommon particular applications, might exceed [the agency's] statutory authority does not warrant judicial condemnation of the rule in its entirety."). We also reject the Company's argument that the Board's new remedial approach will incentivize employees to seek jobs for which they are not qualified in an effort to game the system and drive up employment expenses. As the Board explained, the General Counsel continues to bear the burden of establishing that an employee's search-for-work and work-related expenses are reasonable. *Id.* at 8.

On the record before us, we have no reason to find that the Board's decision to change its remedial framework is "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Fibreboard Paper Prods.*, 379 U.S. at 216 (quoting *Va. Elec. & Power Co.*, 319 U.S. at 540). We therefore deny the petition for review challenging the Board's new make-whole remedial framework.

### III. Conclusion

For the reasons stated above, we grant the petition for review only with regard to the Board's unlawful interrogation finding. We therefore grant the NLRB's cross-application for enforcement with regard to the remaining issues.