# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 14, 2023          Decided July 5, 2024

No. 22-1272

HOSPITAL DE LA CONCEPCION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 22-1297

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*David Fortney* argued the cause for petitioner. On the brief was *José R. González-Nogueras*.

*Brady Francisco-FitzMaurice*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Jennifer A. Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David S.*

*Habenstreit*, Assistant General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: HENDERSON, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Hospital de la Concepción, Inc. (HDLC) petitions the court for review of a decision and order of the National Labor Relations Board (NLRB or Board), reported at 371 NLRB No. 155 (Sept. 29, 2022). In that decision, the Board affirmed and adopted with modifications the findings of an Administrative Law Judge (ALJ). The ALJ found that HDLC violated Section 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) & (5), by failing to bargain with the labor union which represents four units of HDLC's employees, Unidad Laboral de Enfermeras(os) y Empleados de la Salud (Union), before reducing those employees' work hours and by failing to provide the Union with requested information relevant to the decision to reduce work hours. HDLC asserts that it was privileged under the operative collective-bargaining agreements (CBAs) to unilaterally reduce employees' work hours without bargaining, that it had no obligation to provide the Union with the information requested and, in the alternative, that it satisfied any such obligation by responding to the Union's requests. The Board cross-applies for enforcement of its decision and order. For the reasons set forth below, we deny HDLC's petition and grant the NLRB's cross-petition for enforcement.

## I. Background

HDLC operates an acute care hospital in San German, Puerto Rico. On March 12, 2020, then-Governor of Puerto Rico Wanda Vázquez-Garced declared a state of emergency in response to the COVID-19 pandemic. On March 15, 2020, Governor Vázquez-Garced issued an executive order requiring residents to remain in their homes and non-essential businesses to suspend in-person operations. The stay-at-home provision was subject to several enumerated exceptions; in relevant part, residents were permitted to leave their homes to keep medical appointments, visit a hospital, laboratory or other healthcare facility, and travel to and from workplaces deemed essential and therefore not subject to the closure provision—including hospitals. Although the March 15 executive order expired on March 30, subsequent executive orders issued on March 30 and April 12 extended the lockdown measures set forth in the initial order and imposed additional restrictions including the suspension of all elective medical procedures through May 3, 2020.

By mid-April, HDLC observed a decline in its average daily patient volumes. J.A. 917. Based on internal financial projections, HDLC predicted that its operating expenses would eclipse its revenues beginning in March 2020 and continuing through the rest of the year. J.A. 1373. On April 14, 2020, HDLC announced by letter addressed to all employees that it intended to "implement certain suspensions without salary of several employees," "reduce the compensation of the exempt employees" and "reduce the work schedule[s] of many employees that will continue to provide services at the Hospital." J.A. 1369. By way of explanation, the letter stated that HDLC was "forced to [make] a series of difficult decisions" to stem the "unexpected enormous financial impact related to the effects of this pandemic in the increase in cost of the necessary materials and equipment for protection, the dramatic reduction in the census of patients and the limitations

imposed by the Executive Orders in the services that [HDLC] can provide." J.A. 1368–69. That day, HDLC began distributing individualized letters to affected employees specifying their reduced hours.

Four units of HDLC's employees—medical technologists; technical employees and practical nurses; registered nurses; and diet, cafeteria and maintenance employees—are represented by the Union. Although the record does not reflect the precise number of unit employees whose hours were reduced, HDLC does not dispute the ALJ's finding that "the reduction in work hours . . . affected approximately 349 unit employees' pay and other benefits, such as vacation, sick time, holidays, continuing education, and Christmas bonuses, which are accrued based upon the number of hours or days worked per the CBAs," *Hospital De La Concepcion*, 371 NLRB No. 155, slip op. at 7 (Sept. 29, 2022).

On April 15, 2020, Union Representative Ariel Echevarria emailed HDLC's Human Resources Director, Jorge Rodriguez Diaz, requesting that HDLC withdraw its decision to implement a reduction in employees' work schedules because HDLC had provided the Union with neither notice nor an opportunity to bargain over the decision before its implementation. J.A. 376. Echevarria alternatively requested that, if HDLC declined to withdraw the decision, it provide the Union with information responsive to several requests for information relevant to its April 14th action. *See* J.A. 376–77. HDLC declined to withdraw its decision and only partially responded to the Union's information requests.

On May 7, 2020, the Union filed a charge against HDLC with the NLRB, alleging that HDLC had negotiated in bad faith by implementing a reduction in work hours, temporarily closing the Endoscopy Department without notifying or

negotiating with the Union and refusing to provide the Union with information it requested related to those decisions. On March 17, 2021, the Union amended the charge to allege that HDLC violated Section 8(a)(1) and (5) of the Act by unilaterally reducing the work hours of the unit employees without notice to or negotiation with the Union and by refusing to furnish requested information necessary for it to perform its duties as the exclusive bargaining representative of the unit employees. The ALJ found that HDLC violated the Act as alleged and issued a recommended order. *Hospital De La Concepcion*, 371 NLRB No. 155, slip op. at 13–16 (Sept. 29, 2022) (requiring HDLC to rescind the changes it unilaterally implemented in April 2020, negotiate with the Union before implementing any changes in wages, hours or other terms and conditions of employment of the represented employees, and make affected employees whole for any loss of earnings and other benefits suffered as result of the changes, including by compensating affected employees for the adverse tax consequences, if any, of receiving lump-sum backpay awards). On review, the Board affirmed the ALJ's findings and conclusions with some modifications and adopted the recommended order with amendments to the remedy. *Id.* at 1. As modified, the Board's order requires HDLC to: (1) rescind the changes it unilaterally implemented to the unit employees' terms and conditions of employment in April 2020; (2) provide the Union with notice and opportunity to bargain over any changes in unit employees' wages, hours or other terms and conditions of employment before implementing such changes; (3) make the affected employees whole for any loss suffered as a result of the reduction in scheduled hours; (4) compensate affected employees for the adverse tax consequences, if any, of a lump-sum backpay award; (5) furnish to the Union the information it requested in April 2020; and, (6) post and electronically distribute a remedial notice. *Id.* at 2–3.

## II. Analysis

HDLC mounts several challenges to the Board's decision and order. First, it argues that the Board erred in concluding that it violated Section 8(a)(5) and (1) of the Act by failing to bargain with the Union over its decision to reduce unit employees' work hours because, in its view, the CBAs authorized it to take such action unilaterally. Second, with respect to the same violation, HDLC argues that the Board erred by failing to consider whether it had a sound arguable basis to interpret the CBAs as authorizing it to reduce employees' work schedules without bargaining. Third, HDLC argues that the Board erred in concluding that it violated Section 8(a)(5) and (1) of the Act by failing to respond to the Union's requests for information relevant to the decision to reduce unit employees' work hours because, in its view, it had no statutory obligation to provide the requested information; in the alternative, HDLC argues that it provided the Union with the information it requested. Fourth, HDLC argues that the Board erred by finding that it had not established that its failure to bargain was excusable under the economic exigency defense. Finally, HDLC argues that the Board erred in calculating the make-whole remedy insofar as it failed to exclude the interim earnings of any employees who obtained other employment during the period their hours were reduced.

We review Board decisions with a "very high degree of deference." *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 217 (D.C. Cir. 2016) (quoting *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011)). We set aside a Board order only "when it departs from established precedent without reasoned justification, or when the Board's factual determinations are not supported by substantial evidence." *King Soopers, Inc. v. NLRB*, 859 F.3d 23, 29 (D.C. Cir. 2017) (quotation omitted). "We owe no special deference to the

Board's interpretation of contract language, but review it *de novo*, applying 'ordinary principles of contract law.'" *Dist. 4, Commc'ns Workers of Am. AFL-CIO v. NLRB*, 59 F.4th 1302, 1311 (D.C. Cir. 2023) (quoting *Pac. Mar. Ass'n v. NLRB*, 967 F.3d 878, 885 (D.C. Cir. 2020)). With these principles in mind, we address HDLC's arguments in turn and conclude that none supports granting its petition for review.

## A.   Contract Coverage

"An employer violates Section 8(a)(5) and (1) if it makes a material, substantial, and significant change regarding a mandatory subject of bargaining without first providing the union notice and a meaningful opportunity to bargain about the change to agreement or impasse, absent a valid defense." *MV Transp., Inc.*, 368 NLRB No. 66, 2019 WL 4316958, at *4 (Sept. 10, 2019) (citing *NLRB v. Katz*, 369 U.S. 736, 747 (1962)). Mandatory subjects of bargaining include "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d); *accord NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958). It is undisputed that HDLC provided the Union with neither notice nor a meaningful opportunity to bargain about its decision to reduce unit employees' work hours before implementing the change. Insofar as HDLC seeks to challenge the Board's finding that the reduction constituted a material, substantial and significant change to the status quo as unsupported by substantial evidence, HDLC forfeited that argument by failing to address it in its opening brief. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007). Thus, we are left to consider HDLC's argument that it had no obligation to bargain with the Union over its decision to reduce unit employees' work hours because the CBAs authorized it to take such action unilaterally.

It is "well established" that an employer does not violate the NLRA by taking unilateral action with respect to otherwise mandatory subjects of bargaining if the CBA grants the employer the right to take such unilateral action. *MV Transp.*, 368 NLRB No. 66, 2019 WL 4316958, at *1; *accord Pac. Mar. Ass'n*, 967 F.3d at 890; *see also NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993) ("[T]he duty to bargain under the NLRA does not prevent parties from negotiating contract terms that make it unnecessary to bargain over subsequent changes in terms or conditions of employment."). "To conclude that a CBA covers the challenged unilateral conduct, the conduct must fall 'within the compass or scope of contract language granting the employer the right to act unilaterally.'" *Pac. Mar. Ass'n*, 967 F.3d at 891 (quoting *MV Transp.*, 368 NLRB No. 66, 2019 WL 4316958, at *17). We interpret the relevant provisions of the CBAs *de novo*, according no deference to the Board's contract interpretation. *Postal Serv.*, 8 F.3d at 837.

HDLC relies on Article XXXII (the "Management Rights" or "Administration Rights" Article) of the CBAs as authority for its unilateral implementation of reductions to unit employees' work hours. Article XXXII provides as follows:

> Nothing agreed herein will be understood as a limitation of the right of the Hospital to direct and administer its operations according to the criteria of its directors. Therefore, all of the rights, powers, authority and functions which up to the present has been exercised by the Board of Directors, or which in the future it may exercise in relation to the direction and administration of the Hospital, will correspond solely to the Hospital. It is expressly recognized that these rights, powers, authority and

prerogatives include, without any limitation whatsoever the full and exclusive control and operation of the hospital, the determination of the activities which the Hospital will be engaged in, the adoption of standards and procedures referring to the rendering of medical-hospital services, the method and manner in which said services will be rendered, the materials and equipment to be used by the Hospital and the medical, paramedical or office personnel that are required for said purposes; *the right to establish work shifts*; *to make changes to the same* and to assign personnel to cover said shifts, the right to create new positions, to establish job descriptions for all of the work posts or positions, to change said job descriptions, the right to conduct reorganizations, whether partial or total of all of its operations, to eliminate departments and to establish others; to adopt new measures and/or procedures and to make technological changes in all of its operations, the right to maintain the order and the efficiency in the hospital; the right to deem all of its operations terminated as well as also the right to transfer all of its operations or any part of the same to any other entity, corporation or institution. *It also includes the right to promote and to put into effect safety measures and measures of conduct, the determination of the number of employees*, the selection of new employees and the direction of all of its employees, including, without any limitation whatsoever, the right to employ, re-employ, select and train new employees and the right to assign, reassign, *temporarily suspend*,

> reinstate, promote, withdraw, discipline, remove and transfer its employees. . . .

J.A. 369–70 (emphases added); *see also* J.A. 121–22, 205–06, 288–89.

HDLC asserts that the language emphasized in the foregoing excerpt of Article XXXII encompasses reductions to employees' work hours. We disagree. The right to establish and make changes to work *shifts* is not synonymous with a right to make changes to the total number of hours worked. Although changes to an employee's shifts will affect his "hours" in the sense of starting and ending times, such changes do not necessarily effect a change in his total number of work hours per week. *See Control Servs.*, 303 NLRB 481, 483–84 (1991), *enforced*, 961 F.2d 1568 (3d Cir. 1992) (unpublished table decision) (clause reserving employer's right to "schedule hours of employment" did not authorize employer to unilaterally reduce the *number* of hours employees would work). Management rights clauses purporting to reserve the employer's right to reduce employees' working hours are commonly found in collective-bargaining agreements. Where found, the right to reduce work hours tends to be stated explicitly and separately from the right to change work shifts. *See, e.g.*, *MV Transp.*, 368 NLRB No. 66, 2019 WL 4316958, at *21 (reserving company's right to, *inter alia*, "decide and assign all schedules, work hours, [and] work shifts"); *Sts. Mary & Elizabeth Hosp.*, 282 NLRB 73, 81 (1986) (reserving right to "establish, determine and change: shift starting and quitting times, daily and weekly hours of work, and number, time and length of shifts for groups of employees and or individual employees"); *S-B Mfg. Co.*, 270 NLRB 485, 490 (1984) (reserving right to "determine the number of employees, the number of hours, and the schedules of employment"). The rights to promote and to put into effect safety measures and

measures of conduct and to determine the number of employees in no way imply a concomitant right to reduce employees' work hours. And although HDLC characterized the hour reductions as "temporary suspensions without pay" in its April 14, 2020 letter announcing the measure, J.A. 1369, the individualized letters it distributed to affected employees informed them not that they were "temporarily suspended" but that their work schedules were reduced, J.A. 878–915, 1150–1308.[1]

HDLC's proposed interpretation of Article XXXII sits in tension with Article XIII of the CBAs ("Working Days"), which states that, for all unit employees, "[t]he weekly regular work days will be of 40 hours within a period of 168 hours each week" and "[t]he regular daily work day will be of 8 hours within a period of 24 consecutive hours." J.A. 102, 184, 267, 350. Article XIII also provides that unit employees will receive additional pay for "[e]very hour worked in excess of 8 hours a

---

[1] We note that the joint appendix includes a few individualized letters that refer to temporary suspensions rather than reductions in work schedule. *See, e.g.*, J.A. 1331. The record establishes that the employees who received letters containing such language voluntarily requested temporary suspension or unpaid leave—with two exceptions: letters to Joel Vázquez Linares (Indoor Trolley Driver, Security Department) and Julio Rodríguez Colón (Outdoor Trolley Driver, Security Department) dated April 6, 2020 and March 30, 2020, respectively, purported to inform them that they were temporarily suspended, J.A. 1328, 1329, and no other evidence in the record suggests that they requested the suspension. Given that the dates of these letters pre-date the April 14, 2020 letter to all employees, that we do not know whether these employees were represented by the Union, and that the General Counsel represented in his briefing to the Board that no bargaining unit employees were subjected to a non-disciplinary suspension like that described in the letters to Vázquez Linares and Rodríguez Colón, J.A. 1876, we discount them in our analysis.

day" at rates ranging from "time and a half (1-1/2)" to "two times the regular hourly pay of the employee," depending on the unit. *Id.* Moreover, each version of Article XIII includes a section establishing the "work shifts" for each unit, expressed in intervals of start times and end times, and a disclaimer that the establishment of work shifts "will not limit the employer, who[,] for needs of the service, can assign other work times." *Id.* at 102, 184–85, 267–68, 350–51. That Article XIII addresses the regular number of hours worked per day and per week separately from the times of day constituting a work *shift* forecloses, we conclude, an interpretation of Article XXXII's "right to establish work shifts [and] make changes to the same" as encompassing the right to reduce the total number of hours an employee works per week.

HDLC argues that other provisions of the CBAs demonstrate that the parties did not intend to "impose a minimum number of guaranteed hours per day, per week or per month." Blue Br. 21. Even if that were true, it would lend little support to HDLC's contract coverage defense. To avail itself of the defense, HDLC must show that some provision in the CBAs affirmatively permits it to unilaterally reduce employees' hours; the mere absence of a provision expressly prohibiting such action is insufficient. *See Bath Iron Works Corp.*, 345 NLRB 499, 502 (2005), *aff'd sub nom. Bath Marine Draftsmen Ass'n v. NLRB*, 475 F.3d 14 (1st Cir. 2007) ("In the unilateral change cases, the issue is whether the contract *privileges* the conduct."). Accordingly, we find no error in the Board's conclusion that the CBAs did not authorize HDLC to unilaterally reduce its employees' hours.

## B. Sound Arguable Basis

HDLC next argues that the Board should have considered whether HDLC had a sound arguable basis for interpreting the

CBAs to authorize it to unilaterally reduce employees' work hours. The Board correctly determined that the sound arguable basis analysis has no application to this case, in which the General Counsel "alleged and litigated only a unilateral-change violation," not a contract-modification violation. *See* 371 NLRB No. 155, slip op. at 1 n.4.

> The "unilateral change" case and the "contract modification" case are fundamentally different in terms of principle, possible defenses, and remedy. In terms of principle, the "unilateral change" case does not require the General Counsel to show the existence of a contract provision; he need only show that there is an employment practice concerning a mandatory bargaining subject, and that the employer has made a significant change thereto *without bargaining*. The allegation is *a failure to bargain*. In the "contract modification" case, the General Counsel must show a contractual provision, and that the employer has modified the provision. The allegation is a failure to adhere to the contract. . . . [T]he issue [in a contract modification case] is whether the contract *forbade* the conduct. In the unilateral change cases, the issue is whether the contract *privileges* the conduct.

*Bath Iron Works Corp.*, 345 NLRB at 501–02; *accord Pac. Mar. Ass'n*, 967 F.3d at 884–85. An employer charged with an unfair labor practice based on a contract modification theory may raise the defense that it had a "sound arguable basis" for its contrary interpretation of the CBA and that it was not "motivated by union animus or acting in bad faith." *Bath Iron Works*, 345 NLRB at 502 (quotation and ellipses omitted).

Because a unilateral change case requires no showing of a contractual provision modified by the employer, whether the employer had a sound arguable basis for its interpretation of a particular term of the CBA is immaterial.

HDLC suggests that the Board was obligated to consider its sound arguable basis defense because, insofar as the Board decision relied on the finding that the CBAs guaranteed unit employees a minimum of 40 hours per week, its violation was in fact a contract modification under the guise of a unilateral change. We do not read the Board's decision to expressly find that Article XIII "guaranteed" unit employees 40 work hours per week. Our reading of the Board decision comports with that of the Board, that is, it looked to Article XIII "not as a contractual guarantee of a minimum number of hours that HDLC altered, but as one piece of evidence supporting the past practice and status quo of scheduling employees for 40 hours per week," Red Br. 28. In any event, "the authority of the Board and the law of the contract are overlapping, concurrent regimes," and "the Board may proscribe conduct which is an unfair labor practice even though it is also a breach of contract." *NLRB v. Strong*, 393 U.S. 357, 360–61 (1969). As this court recognized in *Pacific Maritime Association*, the same set of facts may support either a contract modification charge or a unilateral change charge. *See* 967 F.3d at 884. Accordingly, we reject HDLC's argument that the Board erred by failing to consider a defense not relevant to the theory under which it was charged.

## C. *Failure to Respond to Information Requests*

HDLC asserts two grounds for its challenge to the Board finding that it violated Section 8(a)(5) and (1) of the Act when it refused to provide certain information requested by the Union relevant to HDLC's decision to unilaterally reduce unit

employees' work hours. First, HDLC argues that it had no duty to provide the Union with any information related to the decision because it had no duty to bargain over the decision. This argument is unavailing because, as noted *supra*, HDLC had a duty to bargain over the decision to reduce unit employees' work hours. Because HDLC makes no challenge on appeal to the relevancy of the requested information to the decision to reduce unit employees' work hours, our conclusion that HDLC had a duty to bargain over that decision compels the conclusion that it had the concomitant duty to provide the Union with the information it requested. Conversely, were we to conclude that HDLC had no duty to bargain over the decision, that would not compel the conclusion that HDLC had no duty to provide the Union with the requested information because it would leave unaddressed the Board's additional basis for concluding that HDLC's refusal to provide the Union with the requested information constituted a violation of Sections 8(a)(5) and (1) of the Act: that the requests "put [HDLC] on notice that the Union considered [HDLC]'s conduct to be contrary to [HDLC]'s contractual and/or statutory obligations, and thus that the Union sought the information for the legitimate non-bargaining purposes of policing its contracts with [HDLC] by evaluating the merits of potential contractual grievances and/or unfair labor practices." *Hospital de la Concepcion*, 371 NLRB No. 155, slip op. at 2 n.4; *see also Stericycle, Inc.*, 370 NLRB No. 89, 2021 WL 663731, at *1 n.5 (Feb. 17, 2021) (requiring employer to supply information requested for the purpose of investigating a potential grievance); *Contract Carriers Corp.*, 339 NLRB 851, 858 (2003) ("[T]he union need not demonstrate that the contract has been violated in order to obtain the desired information.").

Second, HDLC asserts that it fulfilled any duty it had to respond to the Union's information requests. The record belies

HDLC's assertion that it provided the Union with the information it requested regarding the decision to reduce unit employees' work hours. HDLC provided only a partial substantive response to certain of the Union's information requests; HDLC "responded" to the balance of the Union's information requests only in the sense that it raised objections to them. *See* J.A. 1145–49. HDLC further argues that, because the Union never replied to HDLC's responses to the information requests, HDLC "believed no more information was pending or owed to the Union." Blue Br. 38. But HDLC's letter rejecting as irrelevant a full fifteen of the Union's eighteen information requests arrived on May 6, 2020, J.A. 1145–49, and the Union filed its grievance protesting HDLC's failure to provide the requested information the very next day, *see* J.A. 1–2. The record evidence thus does not reflect that the Union somehow misled HDLC into believing that HDLC had responded in full. Because HDLC had a duty to respond to the Union's information requests and the record demonstrates that it failed to do so, we find no error in the Board's conclusion that HDLC violated Section 8(a)(5) and (1) of the Act by failing to provide information that was relevant to a mandatory subject of bargaining and independently relevant to the Union's investigation of a potential grievance.

### D. Exigent Circumstances

HDLC next argues that the Board erroneously concluded that HDLC's failure to bargain with the Union over the decision to reduce unit employees' scheduled work hours before implementing the reduction was not excused by exigent circumstances. Although the Board has recognized an economic exigency exception to an employer's obligation to bargain, application of that exception is limited to "extraordinary events which are 'an unforeseen occurrence, having a major economic effect [requiring] the company to

take *immediate* action.'" *Hankins Lumber Co.*, 316 NLRB 837, 838 (1995) (alteration in original) (emphasis added) (quoting *Angelica Healthcare Servs.*, 284 NLRB 844, 853 (1987)). The employer invoking the economic exigency exception bears a heavy burden. *RBE Elecs. of S.D., Inc.*, 320 NLRB 80, 81 (1995). "Absent a dire financial emergency, the Board has held that economic events such as loss of significant accounts or contracts, operation at a competitive disadvantage, or supply shortages do not justify unilateral action." *Id.* Moreover, "business necessity is not the equivalent of compelling considerations which excuse bargaining. Were that the case, a respondent faced with a gloomy economic outlook could take any unilateral action it wished or violate any of the terms of a contract which it had signed simply because it was being squeezed financially." *Hankins Lumber Co.*, 316 NLRB at 838 (citing *Farina Corp.*, 310 NLRB 318, 321 (1993)).

On this record, we find no error with the Board's conclusion that HDLC failed to carry its burden to demonstrate that the economic exigencies exception privileged its unilateral reduction in employees' scheduled work hours. HDLC argues that it faced an "uncertain situation" because the COVID-19 pandemic and related lockdowns "had an economic impact on the Hospital." Blue Br. 33. But, on the record before us, HDLC has failed to offer "evidence that its financial situation was so dire that it either had to implement its final offer when it did" without bargaining first "or suffer financial ruin." *U.S. Testing Co.*, 324 NLRB 854, 854 (1997). The Board's determination that HDLC's claim that it reasonably expected to sustain operating losses unless it reduced labor costs starting in April was insufficient to support application of the exception comports with Board precedent on the economic exigency exception, which sets a high bar for finding "compelling" circumstances and restricts "requiring immediate action" to the literal sense of each word in that phrase. *See, e.g.*, *Seaport*

*Printing & Ad Specialties, Inc.*, 351 NLRB 1269, 1270 (2007) (finding that employer was excused from bargaining layoffs when mayor ordered a mandatory evacuation of the city due to the impending arrival of a hurricane, forcing closure of the employer's facility, but that employer was *not* excused from bargaining over the effects of the layoff decision and related personnel decisions after the hurricane had passed).

### E.    Exclusion of Interim Earnings

Finally, HDLC argues that the court should modify the Board's make-whole remedy to exclude interim earnings, if any, of employees who obtained other employment during the period their hours were reduced. The Board determined that the method of calculating backpay awards established in *Ogle Protection Service*, 183 NLRB 682 (1970), applied because unit employees were neither laid off nor terminated. *See Deming Hosp. Corp. v. NLRB*, 665 F.3d 196, 200 (D.C. Cir. 2011). In *Community Health Services, Inc.*, 361 NLRB 333, 334–38 (2014), the NLRB established as a matter of policy that interim earnings should not be deducted when the *Ogle* method of calculating backpay is applied in cases involving economic loss but no cessation of employment. HDLC did not challenge the General Counsel's cross-exceptions to the ALJ's recommendation, which explicitly requested that the Board apply *Ogle* as modified by *Community Health Services*. J.A. 1877. HDLC's failure to object regarding the inclusion of interim earnings in an answering brief before the Board deprives this court of jurisdiction to review it. *See Parkwood Dev. Ctr., Inc. v. NLRB*, 521 F.3d 404, 410 (D.C. Cir. 2008); 29 U.S.C. § 160(e). Accordingly, we cannot consider HDLC's argument that the Board should have excluded interim earnings from its remedy.

For the foregoing reasons, we deny HDLC's petition for review and grant the Board's cross-application for enforcement of its order.

*So ordered.*